IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Marcellus Shale Coalition,      :
     :
                  Petitioner      :
     :
                    v.      : No. 573 M.D. 2016
     : Argued: December 6, 2017
Department of Environmental      :
Protection of the Commonwealth of      :
Pennsylvania and Environmental      :
Quality Board of the Commonwealth      :
of Pennsylvania,      :
     :
                Respondents      :

BEFORE:     HONORABLE MARY HANNAH LEAVITT, President Judge
                  HONORABLE RENÉE COHN JUBELIRER, Judge
                  HONORABLE ROBERT SIMPSON, Judge
                  HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE MICHAEL H. WOJCIK, Judge


OPINION BY JUDGE WOJCIK                     FILED: August 23, 2018


Before this Court is the Marcellus Shale Coalition's (Coalition)[1] Application for Partial Summary Relief (Application) seeking summary relief on Count I of its Petition for Review in the Nature of a Complaint Seeking Declaratory and Injunctive Relief (Petition). In Count I, the Coalition challenges recently promulgated regulations related to unconventional oil and gas well operations contained in Title 25, Chapter 78a of the Pennsylvania Administrative Code (Chapter 78a Regulations), namely, Section 78a.15(f) and (g) and certain definitions

---

[1] The Coalition describes itself as a non-profit membership organization whose members explore, produce, transmit, and distribute natural gas from the Marcellus and Utica Shale formations. *See* Petition for Review ¶¶3-4.

in Section 78a.1 pertaining to public resources,[2] 25 Pa. Code §78a.15(f)-(g), 78a.1 (referred to generally as the Public Resource Regulations). For the reasons that follow, we grant the Application in part with respect to the challenged definitions, as well as Section 78a.15(g)'s mandate regarding consideration of comments and recommendations submitted by municipalities, which we declare as void and unenforceable, and deny the Application in all other respects.

## I. Background

The Environmental Quality Board (Board) published the Chapter 78a Regulations in the *Pennsylvania Bulletin* on October 8, 2016, which immediately went into effect. 46 Pa. B. 6431 (2016). The Chapter 78a Regulations relate to surface activities associated with the development of unconventional wells.

On October 13, 2016, the Coalition filed its Petition against the Board and the Department of Environmental Protection (Department) (collectively, the Agencies) seeking pre-enforcement review of the Chapter 78a Regulations. The Coalition asserts seven counts and requests declaratory relief pursuant to the Declaratory Judgments Act.[3]

In Count I, the Coalition challenges the validity of Section 78a.15(f) and (g) pertaining to public resources and the related definitions contained in Section 78a.1 of the Chapter 78a Regulations. The Coalition claims that Section 78a.15 injects an entirely new pre-permitting process without statutory authority. It

---

[2] Specifically, the Coalition challenges the definitions of "other critical communities," "common areas of a school's property," "playground," and "public resource agency" in Section 78a.1 of the Chapter 78a Regulations.

[3] 42 Pa. C.S. §§7531-7541.

challenges the attendant definitions of "other critical communities," "common areas of a school's property," "playground," and "public resource agency" in Section 78a.1.[4]

Contemporaneous with the Petition, the Coalition filed an application for expedited special relief to preliminarily enjoin the Department's enforcement of the Chapter 78a Regulations to prevent immediate, substantial and irreparable harm to the Coalition and its members. On November 8, 2016, following an evidentiary hearing,[5] this Court granted in part and denied in part the Coalition's application,

---

[4] In addition, the Coalition asserts the following counts:

- Count II challenging the validity of 25 Pa. Code §§78a.52a and 78a.73(c) and (d), pertaining to area of review;

- Count III challenging the validity of 25 Pa. Code §78a.58(d), pertaining to onsite processing;

- Count IV challenging the validity of 25 Pa. Code §§78a.59a and 78a.59c, pertaining to impoundments;

- Count V challenging the validity of 25 Pa. Code §78a.645, pertaining to site restoration;

- Count VI challenging the validity of 25 Pa. Code §78a.66(c), pertaining to remediation of spills; and

- Count VII challenging the validity of 25 Pa. Code §78a.121(b), pertaining to waste reporting.

[5] The evidence consisted of:

- Transcript of the EQB meeting held on February 3, 2016;

- Copy of Chapter 78a Regulations;

3

preliminarily enjoining portions of the Chapter 78a Regulations challenged. With regard to Count I, this Court enjoined application of the Public Resource Regulations "only to the extent that they include 'common areas o[f] a school's property or a playground' and 'species of special concern' as 'public resources' and include 'playground owners' in the definition of 'public resource agency.'" Preliminary Injunction Order, 11/8/16, at 1-2.

The Agencies appealed the Preliminary Injunction Order to the Pennsylvania Supreme Court. The Supreme Court affirmed in part and reversed in part. *Marcellus Shale Coalition v. Department of Environmental Protection*, 185 A.3d 985 (Pa. 2018). Of relevance here, the Supreme Court affirmed the grant of preliminary injunctive relief as to Count I on the basis that the Coalition raised a substantial legal issue in relation to the Public Resource Regulations and satisfied the other prongs for injunctive relief. *Id.* at 987-90.

Meanwhile, in this Court, the Agencies jointly responded to the Petition. We entered a Case Management Order requiring fact and expert testimony

- Regulatory Analysis Form (RAF) submitted to the Independent Regulatory Review Commission (IRRC) for consideration with Chapter 78a Regulations;

- Letter from the Senate Environmental Resources and Energy Committee to the IRRC and the [Board], dated April 12, 2016, and letter from the House of Representatives Environmental Resources and Energy Committee to the IRRC, dated April 15, 2016 (admitted only for the purpose of establishing that Senate and House committees participated in the regulatory review process and disapproved of the proposed Chapter 78a Regulations).

- Testimony of Scott Perry, the Department's Secretary for the Office of Oil and Gas Management.

*Marcellus Shale Coalition v. Department of Environmental Protection* (Pa. Cmwlth., No. 573 M.D. 2016, filed November 8, 2016) (Preliminary Injunction Opinion and Order), slip op. at 9.

4

to conclude by January 31, 2018, and directing the filing of all dispositive motions by February 28, 2018.[6]  *See* Commonwealth Court Order, 7/12/17.

On August 31, 2017, the Coalition filed the present Application seeking summary relief on Count I of the Petition.[7]  The Agencies filed an answer in opposition.  The parties then filed briefs in support of their respective positions.  In addition, amici curiae[8] filed briefs in support of the Agencies' position.  On December 6, 2017, this Court sitting *en banc* heard argument on the Application.

## II. Public Resource Regulations

We begin by setting forth the regulations at issue.  Section 78a.15(f) of the Chapter 78a Regulations, which sets forth application requirements, provides:

> (f) An applicant proposing to drill a well at a location that *may impact a public resource* as provided in paragraph (1) *shall notify the applicable public resource agency*, if any, in accordance with paragraph (2).  The applicant shall also provide the information in paragraph (3) to the Department in the well permit application.
>
> (1) This subsection applies if the proposed limit of disturbance of the well site is located:
>
> (i) In or within 200 feet of a publicly owned park, forest, game land or wildlife area.

---

[6] This date was later extended to March 14, 2018.  *See* Commonwealth Court Order, 2/27/18.

[7] On March 14, 2018, the Coalition filed an application for partial summary relief on Counts III, V and VI of the Petition, which is pending.

[8] Damascus Citizens for Sustainability, Inc. and the Sierra Club.

5

(ii) In or within the corridor of a State or National scenic river.

(iii) Within 200 feet of a National natural landmark.

(iv) *In a location that will impact other critical communities*.

(v) Within 200 feet of a historical or archeological site listed on the Federal or State list of historic places.

(vi) Within 200 feet of *common areas on a school's property or a playground*.

(vii) Within zones 1 or 2 of a wellhead protection area as part of a wellhead protection program approved under §109.713 (relating to wellhead protection program).

(viii) Within 1,000 feet of a water well, surface water intake, reservoir or other water supply extraction point used by a water purveyor.

(2) The applicant *shall notify the public resource agency responsible for managing the public resource* identified in paragraph (1), if any. The applicant shall forward by certified mail a copy of the plat identifying the proposed limit of disturbance of the well site and information in paragraph (3) to the public resource agency at least 30 days prior to submitting its well permit application to the Department. The applicant shall submit proof of notification with the well permit application. From the date of notification, *the public resource agency has 30 days to provide written comments to the Department* and the applicant on the functions and uses of the public resource and the measures, if any, that the public resource agency recommends the Department consider to avoid, minimize or otherwise mitigate probable harmful impacts to the public resource where the well, well site and access road is located. The applicant

may provide a response to the Department to the comments.

(3) *The applicant shall include the following information in the well permit application* on forms provided by the Department:

(i) *An identification of the public resource.*

(ii) A description of the functions and uses of the public resource.

(iii) A description of the measures proposed to be taken to avoid, minimize or otherwise mitigate impacts, if any.

(4) The information required under paragraph (3) shall be limited to the discrete area of the public resource that may be affected by the well, well site and access road.

25 Pa. Code §78a.15(f) (emphasis added).

Section 78a.15(g), which guides the Department's consideration, provides:

(g) *The Department will consider the following prior to conditioning a well permit based on impacts to public resources*:

(1) Compliance with all applicable statutes and regulations.

(2) The proposed measures to avoid, minimize or otherwise mitigate the impacts to public resources.

(3) Other measures necessary to protect against a probable harmful impact to the functions and uses of the public resource.

(4) The comments and recommendations submitted by public resource agencies, if any, and the applicant's response, if any.

7

(5) The optimal development of the gas resources and the property rights of gas owners.

25 Pa. Code §78a.15(g) (emphasis added).

The regulations define the following corresponding terms:

*Common areas of a school's property* – An area on a school's property accessible to the general public for recreational purposes. For the purposes of this definition, a school is a facility providing elementary, secondary or postsecondary educational services.

\* \* \*

*Other critical communities* –

    (i) Species of special concern identified on a [Pennsylvania Natural Diversity Inventory (PNDI)[9]] receipt, including plant or animal species:

---

[9] The regulations define "PNDI" and "PNDI receipt" as:

PNDI – Pennsylvania Natural Diversity Inventory – The Pennsylvania Natural Heritage Program's database containing data identifying and describing this Commonwealth's ecological information, including plant and animal species classified as threatened and endangered as well as other critical communities provided by the Department of Conservation and Natural Resources, the Fish and Boat Commission, the Game Commission and the United States Fish and Wildlife Service. The database informs the online environmental review tool. The database contains only those known occurrences of threatened and endangered species and other critical communities, and is a component of the Pennsylvania Conservation Explorer.

PNDI receipt – The results generated by the [PNDI] Environmental Review Tool containing information regarding threatened and endangered species and other critical communities.

25 Pa. Code §78a.1.

8

(A) In a proposed status categorized as proposed endangered, proposed threatened, proposed rare or candidate.

(B) That are classified as rare or tentatively undetermined.

(ii) The term does not include threatened and endangered species.

\* \* \*

*Playground* –

(i) An outdoor area provided to the general public for recreational purposes.

(ii) The term includes community-operated recreational facilities.

\* \* \*

*Public resource agency* – An entity responsible for managing a public resource identified in §78a.15(d) or (f)(1) (relating to application requirements) including the Department of Conservation and Natural Resources, the Fish and Boat Commission, the Game Commission, the United States Fish and Wildlife Service, the United States National Park Service, the United States Army Corps of Engineers, the United States Forest Service, counties, *municipalities and playground owners*.

25 Pa. Code §78a.1 (emphasis added).

## III. Issues

The Coalition contends that the new well permit application provisions in Section 78a.15(f) and (g), along with applicable definitions in Section 78a.1, are unlawful, unreasonable and unenforceable. Specifically, the Coalition challenges Section 78a.15(f)(1)(iv) (requiring well applicants to identify and provide

9

information concerning "other critical communities"), 78a.15(f)(1)(vi) (requiring well applicants to identify and provide information concerning "common areas of a school's property or a playground" in a well permit application), 78a.15(f)(2) and (g) (relating to "public resource agency"), and Section 78a.1 (corresponding definitions). The Coalition claims that the Public Resource Regulations lack statutory authorization and contradict Act 13 of 2012, a statute amending the Pennsylvania Oil and Gas Act (Act 13), 58 Pa. C.S. §§2301-3504,[10] as well as other Pennsylvania statutes and regulations applicable to the industry; are contrary to the Supreme Court's holding in *Robinson Township v. Commonwealth*, 83 A.3d 901 (Pa. 2013) (*Robinson II*);[11] were not promulgated pursuant to proper procedures; are void for vagueness; violate due process; violate Article III, Section 32 of the Pennsylvania Constitution; and/or are unreasonable. Petition for Review ¶¶44(a)-(k). The Coalition further claims that the Board failed to heed the direction of Section 3215(e) of Act 13, 58 Pa. C.S. §3215(e), to develop criteria to ensure the optimal development of oil and gas resources and respect the property rights of oil and gas owners before the Department may impose conditions necessary to protect

---

[10] "Act 13 comprises sweeping legislation affecting Pennsylvania's environment and, in particular, the exploitation and recovery of natural gas in a geological formation known as the Marcellus Shale." *Robinson Township v. Commonwealth*, 83 A.3d 901, 913 (Pa. 2013) (*Robinson II*).

[11] *Robinson II* is a plurality opinion, authored by former Chief Justice Castille, and joined by Justice Todd and former Justice McCaffery. Justice Baer joined portions of the opinion, but authored a concurring opinion where his analysis diverged. Justice Saylor, now Chief Justice, and former Justice Eakin authored dissenting opinions. Former Justice Orie Melvin did not participate. To the extent Justice Baer's "concurring opinion enumerates the portions of the plurality's opinion in which the author joins or disagrees, those portions of agreement gain precedential value." *Commonwealth v. Brown*, 23 A.3d 544, 556 (Pa. Super. 2011). This opinion denotes where *Robinson II* is precedential.

against probable harmful impacts to public resources. The Public Resource Regulations far exceed any legitimate public resource protection. Where the Public Resource Regulations give meaning to the words used in Act 13, they are either untethered from the Agencies' statutory authority or directly in conflict with it. For these reasons, the Coalition asks this Court to declare Section 78a.15(f)-(g), and the definitions of "other critical communities," "common areas of a school's property," "playground," and "public resource agency," in Section 78a.1 as unlawful, void and unenforceable. As there are no disputed material facts with respect to Count I of the Petition, the Coalition maintains that Count I is ripe for summary relief.

## IV. Discussion
### A. Legal Standards
#### 1. Summary Relief

Rule 1532(b) of the Pennsylvania Rules of Appellate Procedure provides that "the court may on application enter judgment if the right of the applicant thereto is clear." Pa. R.A.P. 1532(b); *see Scarnati v. Wolf*, 173 A.3d 1110, 1118 (Pa. 2017) ("The standard for granting summary relief turns upon whether the applicant's right to relief is clear. Summary relief on a petition for review is similar to the relief provided by a grant of summary judgment. Pa. R.A.P. 1532, Official Note.") (footnote omitted). "Summary judgment is appropriate where, after the close of pleadings, 'there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report.'" *Scarnati*, 173 A.3d at 1118 (quoting Pa. R.C.P. No. 1035.2(a)). Conversely, "[w]here there are material issues of fact in dispute or if it is not clear that the applicant is entitled to judgment as a matter of law, the application will be denied." *Sherman v. Kaiser*, 664 A.2d 221, 225 (Pa. Cmwlth. 1995). "A fact is considered material if its resolution could affect the outcome of

11

the case under the governing law." *Hospital & Healthsystem Association of Pennsylvania v. Commonwealth*, 77 A.3d 587, 602 (Pa. 2013).

The parties dispute whether this matter is ripe for summary relief. The Coalition asserts that there are no material facts in issue regarding Count I while the Agencies argue there are. The dispute centers over whether the oil and gas industry is subject to different treatment. The Coalition contends that Section 78a.15 imposes new obligations on applicants for well permits not imposed upon other industries. According to the Coalition, the requirement that unconventional well operators must protect unlisted "species of special concern" is not reasonably based on any difference between the unconventional well industry and other industries that justifies dissimilar treatment.

The Agencies counter that other regulatory programs all require the equivalent of an "environmental analysis" or "impact analysis" that involves consideration of impacts to species other than threatened or endangered species. The Agencies contend that whether the Public Resource Regulations treat the unconventional gas and oil industry differently is a material fact in dispute.

Contrary to the Agencies' assertions, the issue of whether the Public Resource Regulations treat the unconventional gas and oil industry differently by requiring consideration of "species of special concern" is not a disputed fact but rather one that may be determined based on comparison of statutory and regulatory provisions. Thus, we conclude that the Coalition's Application seeking a declaration that the Public Resource Regulations are unlawful and unenforceable is ripe for disposition.[12]

_____

[12] For purposes of a motion for summary relief, the record consists of pleadings, answers to interrogatories, admissions and affidavits, and other documents of record. *Meggett v.*

12

## 2. Declaratory Relief

Petitions for declaratory judgment are governed by the Declaratory Judgments Act. *GTECH Corp. v. Department of Revenue*, 965 A.2d 1276, 1285 (Pa. Cmwlth. 2009). "The purpose of the Declaratory Judgments Act 'is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and is to be liberally construed and administered.'" *Markham v. Wolf*, 147 A.3d 1259, 1270 (Pa. Cmwlth. 2016) (quoting Section 7541 of the Declaratory Judgments Act, 42 Pa. C.S. §7541). "Declaratory judgment as to the rights, status or legal relationships is appropriate only where there exists an actual controversy." *Id.* "An actual controversy exists when litigation is both imminent and inevitable and the declaration sought will practically help to end the controversy between the parties." *Id.* (quotation omitted). "Granting or denying a petition for a declaratory judgment is committed to the sound discretion of a court of original jurisdiction." *Id.* (quoting *GTECH*, 965 A.2d at 1285). With these legal standards in mind, we examine the Coalition's substantive claims.

## B. Section 78a.15(f) and (g) – "Pre-Permit Process"
### 1. Contentions

First, the Coalition contends that the "pre-permit process" established under Section 78a.15(f) and (g) is unlawful and unenforceable. According to the Coalition, the Agencies have created an elaborate process without statutory authority, and without fully understanding the burden it imposes on well permit

*Pennsylvania Department of Corrections*, 892 A.2d 872, 879 n.13 (Pa. Cmwlth. 2006) (citing Pa. R.A.P. 106 (certain Pennsylvania Rules of Civil Procedure apply to appellate courts in matters brought in the court's original jurisdiction)); Pa. R.C.P. No. 1035.1 (defining the record for considering a request for summary judgment).

applicants. Specifically, the Coalition argues that the Public Resource Regulations are contrary to and circumvent statutory authority, namely, Sections 3211, 3212, and 3212.1 of Act 13. To the extent the Agencies rely on Section 3215(c) of Act 13 for authority, the Coalition maintains that the Supreme Court found portions of Section 3215(c) unconstitutional in *Robinson II*, thereby negating the statutory basis for the Public Resource Regulations.[13]

In addition, the Coalition challenges the Board's failure to develop criteria required by Section 3215(e) of Act 13 as a prerequisite to the Department's authority to impose permit conditions related to public resources. Section 78a.15(g) of the Chapter 78a Regulations is merely an expanded recitation of the statutory language in Section 3215(c) of Act 13, without any explanation of how the Department will balance and evaluate each item it must consider to arrive at appropriate permit conditions.

Finally, the Coalition claims that the Public Resource Regulations fail to comply with the Regulatory Review Act (Review Act)[14] and rulemaking

---

[13] To the extent that the Coalition asserts that Section 3215(c) of Act 13 is unconstitutional in its brief because it fails to provide ascertainable standards by which the Department is to consider the impact of wells on public resources, the Coalition did not present this issue in its Petition or Application. Rather, the Coalition focuses its claims on whether the Public Resource Regulations are unconstitutional, not Section 3215(c) of the Act. Although the Coalition asserts that the Supreme Court's decision in *Robinson II* enjoined application of Section 3215(c), at no point did the Coalition plead an independent basis for this Court to find Section 3215(c) unconstitutional. We decline to entertain this new argument.

[14] Act of June 25, 1982, P.L. 633, *as amended*, 71 P.S. §§745.1-745.14.

procedures. More particularly, it asserts the regulatory analysis form (RAF)[15] does not include any estimates for the cost of compliance with mandated mitigation measures.

The Agencies counter that the Public Resource Regulations are lawful as they fall squarely within the Department's statutory authorities and constitutional duties. The Chapter 78a Regulations were properly promulgated in accordance with the regulatory review process set forth in the Review Act; the Commonwealth Attorneys Act;[16] the Commonwealth Documents Law (Documents Law);[17] and Sections 1917-A and 1920-A of the Administrative Code of 1929.[18] *See* 46 Pa. B. 6432 (2016). Therefore, the regulations have an extremely strong presumption of validity, which the Coalition's claims do not overcome. Most importantly, the Public Resource Regulations do not change the Department's powers to issue, condition, or deny permits. These regulations simply put more information before the Department as it considers the possible impacts of unconventional natural gas well development upon public natural resources. It is not unlawful to ask an applicant to provide more information so that the Department can accurately assess the potential impacts of the well development on public resources. Section 3215(c) of Act 13 authorizes the Department to condition well permits to minimize impact

---

[15] The RAF is a form submitted by agencies to the IRRC that contains an analysis of the proposed regulation, including, *inter alia*, the statutory authorization for the regulation and estimates of the cost of compliance. Section 5 of the Review Act, 71 P.S. §745.5.

[16] Act of October 15, 1980, P.L. 950, *as amended*, 71 P.S. §§732-101-732-506.

[17] Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§1102-1602, and 45 Pa. C.S. §§501-907.

[18] Act of April 9, 1929, P.L. 177, added by the Act of December 3, 1970, P.L. 834, *as amended*, 71 P.S. §§510-17, 510-20.

to public resources. The Coalition's characterization of *Robinson II* is incorrect. *Robinson II* merely limited, but did not negate, the Department's authority under Section 3215(c).

The Agencies further assert that the Public Resource Regulations are not unconstitutionally vague because they provide ample criteria to guide the Department in developing appropriate permit conditions. The Public Resource Regulations establish criteria for the Department to consider the potential impacts of drilling a proposed unconventional well on surrounding public resources and to evaluate and condition permits accordingly; require applicants to notify public resource agencies of potential impacts; and provide public resource agencies the opportunity to comment.

Finally, the Agencies assert that the Coalition has offered no evidence or legal argument in support of its claim that the RAF is insufficient with respect to the cost of compliance with the Public Resource Regulations. The Review Act does not authorize a challenge to the review conducted by the Independent Regulatory Review Commission (IRRC).

### 2. Analysis
### a. Statutory Authority

"An agency clearly has the authority to adopt rules with respect to the administration of a statute where the statute specifically empowers the agency to do so." *Bailey v. Zoning Board of Adjustment of City of Philadelphia*, 801 A.2d 492, 500 (Pa. 2002). A properly promulgated regulation "is valid and binding upon courts as a statute so long as it is (a) adopted within the agency's granted power, (b) issued pursuant to proper procedure, and (c) reasonable." *Tire Jockey Service, Inc. v. Department of Environmental Protection*, 915 A.2d 1165, 1186 (Pa. 2007); *accord*

16

*Bailey*, 801 A.2d at 500; *Pennsylvania Human Relations Commission v. Uniontown Area School District*, 313 A.2d 156, 169 (Pa. 1973). "[E]ven where a statute does not explicitly provide an agency with rule-making powers, if the agency is directed to operate under the statute, the agency may also create rules concerning its administration of the statute based on its interpretation of the statute." *Bailey*, 801 A.2d at 500.

> As our Supreme Court has noted:

> [S]ubstantive rulemaking is a widely used administrative practice, and its use should be upheld whenever the statutory delegation can reasonably be construed to authorize it. In determining whether a power has been delegated we are not limited to the letter of the law, but must look to the purpose of the statute and its reasonable effect.

*Eagle Environmental II, L.P. v. Department of Environmental Protection*, 884 A.2d 867, 878 (Pa. 2005) (internal quotations and citations omitted). "[A]n agency's interpretation of its enabling statute is entitled to great weight . . . ." *Id.*

However, this authority is not unfettered. Where an agency creates a rule pursuant to its interpretative powers, "a court shall only defer to the rule if it is reasonable and 'genuinely tracks the meaning of the underlying statute.'" *Bailey*, 801 A.2d at 500 (quoting *Borough of Pottstown v. Pennsylvania Municipal Retirement Board*, 712 A.2d 741, 743 (Pa. 1998)). A court cannot substitute its own judgment for that of the agency. *Uniontown*, 313 A.2d at 169. However, no deference is due where an agency exceeds its legal authority or its interpretation is clearly erroneous. *See Tire Jockey*, 915 A.2d at 1186; *Eagle Environmental*, 884 A.2d at 878.

17

As our Supreme Court has explained, a regulation will survive or fail based on the following considerations:

> An interpretative rule . . . depends for its validity . . . upon the willingness of a reviewing court to say that it in fact tracks the meaning of the statute it interprets. While courts traditionally accord the interpretation of the agency charged with administration of the act some deference, the meaning of a statute is essentially a question of law for the court, and, when convinced that the interpretative regulation adopted by an administrative agency is unwise or violative of legislative intent, courts disregard the regulation . . . ."

*Commonwealth v. Gilmour Manufacturing Co.*, 822 A.2d 676, 679 (Pa. 2003) (quoting *Girard School District v. Pittenger*, 392 A.2d 261, 263 (Pa. 1978)).

Indeed, "[a]dministrative agencies are not empowered to make rules and regulations which are violative of or exceed the powers given them by the statutes and the law, but must keep within the bounds of their statutory authority in the promulgation of general rules and orders." *Pennsylvania Association of Life Underwriters v. Department of Insurance*, 371 A.2d 564, 566 (Pa. Cmwlth. 1977), *aff'd*, 393 A.2d 1131 (Pa. 1978). "An agency cannot confer authority upon itself by regulation. Any power exercised by an agency must be conferred by the legislature in express terms." *Sunrise Energy, LLC v. FirstEnergy Corp.*, 148 A.3d 894, 907 (Pa. Cmwlth. 2016), *appeal denied*, 169 A.3d 1025 (Pa. 2017).

Turning to the statutory authority applicable here, Section 3274 of Act 13 expressly grants authority to the Board to promulgate regulations to implement and fulfill the purpose of the chapter. 58 Pa. C.S. §3274. The purpose of Act 13 is to "[p]ermit the optimal development of oil and gas resources while at the same time protecting the health, safety, environment and property of Pennsylvania citizens." 58 Pa. C.S. §3202(1). Additional purposes include protecting the safety of personnel

18

and facilities employed in coal mining or exploration, development, storage and production of natural gas or oil; the safety and property rights of persons residing in areas where mining, exploration, development, storage or production occurs; and the natural resources, environmental rights and values secured by the Constitution of Pennsylvania. 58 Pa. C.S. §3202(2)-(4).

In furtherance of these goals, the General Assembly assigned the Department the duty to consider impacts to public resources when making a determination on a well permit. Section 3215(c) of Act 13. Specifically, Section 3215(c) provides:

> (c) Impact.–*On making a determination on a well permit, the department shall consider the impact of the proposed well on public resources*, including, *but not limited to*:
>
> (1) Publicly owned parks, forests, game lands and wildlife areas.
>
> (2) National or State scenic rivers.
>
> (3) National natural landmarks.
>
> (4) *Habitats of rare and endangered flora and fauna and other critical communities.*
>
> (5) Historical and archaeological sites listed on the Federal or State list of historic places.
>
> (6) Sources used for public drinking supplies in accordance with subsection (b).

58 Pa. C.S. §3215(c) (emphasis added).

In addition, Section 3215(e) provides:

> (e) Regulation criteria.–The Environmental Quality Board shall develop by regulation criteria:

19

(1) For the department to utilize for conditioning a well permit based on its impact to the public resources identified under subsection (c) and for ensuring optimal development of oil and gas resources and respecting property rights of oil and gas owners.

(2) For appeal to the Environmental Hearing Board of a permit containing conditions imposed by the department. The regulations shall also provide that the department has the burden of proving that the conditions were necessary to protect against a probable harmful impact of the public resources.

58 Pa. C.S. §3215(e).

In *Robinson II*, the Supreme Court considered the constitutionality of portions of Section 3215 of Act 13. The Supreme Court[19] declared Section 3215(b), authorizing a waiver of setbacks, as unconstitutional and enjoined application or enforcement of Section 3215(b) "in its entirety." *Robinson II*, 83 A.3d at 1000. The Court also addressed the severability of other provisions in Section 3215, in light of its conclusion that Section 3215(b) was unconstitutional, including Section 3215(c) and (e). The Supreme Court concluded, without any additional supporting analysis, "[I]nsofar as Section 3215(c) and (e) *are part of the Section 3215(b) decisional process*, these provisions as well are incomplete and incapable of execution in accordance with legislative intent. Application of Section 3215(c) and (e) is, therefore, also enjoined." *Id.* at 999 (emphasis added). The Supreme Court's mandate in this regard provides, "Sections 3215(c) and (e), and 3305 through 3309

---

[19] Justice Baer joined in the plurality's decision with respect to its analysis of Section 3125(b), thereby lending precedential value to this portion of the opinion. *Robinson II*, 83 A.3d at 1000 (Baer, J., concurring). *See Brown*, 23 A.3d at 556 ("In cases where a concurring opinion enumerates the portions of the plurality's opinion in which the author joins or disagrees, those portions of agreement gain precedential value.").

are not severable *to the extent* that these provisions implement or enforce those Sections of Act 13 which we have found invalid and, *in this respect*, their application or enforcement is also enjoined." *Id.* at 1000 (emphasis added).

Later, in *Pennsylvania Independent Oil and Gas Association v. Department of Environmental Protection*, 146 A.3d 820 (Pa. Cmwlth. 2016), *aff'd*, 161 A.3d 949 (Pa. 2017) (*PIOGA*), this Court clarified the Supreme Court's mandate in *Robinson II* with respect to Section 3215(c) and (e). In *PIOGA*, the petitioner requested a declaration from this Court that the Department has no authority to mandate that well permit applicants satisfy any of the requirements of Section 3215(c) because the Supreme Court enjoined enforcement of that provision. We restated the Supreme Court's ruling in *Robinson II* that Section 3215(c) and (e) are not severable "to the extent" that they implement or enforce Section 3215(b) of Act 13 and enjoined these sections "in this respect." 146 A.3d at 827-28 (quoting *Robinson II*, 83 A.3d at 1000) (emphasis omitted). We interpreted "to the extent" and "in this respect" as providing a narrower injunction with respect to Section 3215(c) and (e). *Id.* at 829. We explained that by using this language of limitation, the Supreme Court only intended to enjoin these provisions in connection to the water source and waiver setback provisions in Section 3215(b), which the Court declared unconstitutional. *Id.* "In practice, this means that when [the Department] considers the impact of a proposed well" on public resources, "it is not constrained to do so 'in accordance with' enjoined Section 3215(b)." *Id.* at 829-30. Contrary to the Coalition's assertions, *Robinson II* did not negate the statutory basis for the Public Resource Regulations. *PIOGA*. Rather, it just curtailed it with respect to water source and waiver setback provisions. *See id.* Therefore, Section 3215(c), to

21

the extent it does not implicate Section 3215(b), remains a viable source of statutory authority for the Public Resource Regulations.

In addition, Sections 3211 and 3212 of Act 13 provide express requirements for well permit applicants to provide notice to certain enumerated parties and objection opportunities for a subset of such parties. Section 3211 of Act 13 provides detailed instructions related to well permits, including the information to be provided in a well permit application, a specific list of persons to whom the plat must be mailed, and the nature of this third-party notification. The General Assembly revised several subsections in Act 13 to include specific direction regarding notice of well permit applications. *See* Section 3211(a) (revised to include permits to operate abandoned or orphan wells), (b) (revised to require additional information in the permit application, including a list of municipalities adjacent to the well site and water supply owners within 3,000 feet of an unconventional well bore, and that plats be forwarded to an expanded list of persons in an expanded geographic area for unconventional oil and gas operations), and (b.2) (directing revisions to the well permit application form). In addition, Section 3211(e) of Act 13 requires the Department to issue well permits within 45 days of submission unless it denies the permit application for one of the express reasons set forth in subsection 3211(e.1). 58 Pa. C.S. §3211(e). Section 3212.1 of Act 13 defines who may comment on or object to a well permit application. 58 Pa. C.S. §3212.1.

With this statutory authority in mind, we examine the Coalition's challenge to the pre-permit process that requires well applicants to provide information to the Department in the well permit applications and notice to applicable public resource agencies, and sets forth the information the Department will consider prior to conditioning a well permit based on impacts to public

22

resources. 25 Pa. Code §75a.15(f), (g). Act 13 requires the Department to consider the impact of proposed wells on various public resources when making a determination on a well permit. 58 Pa. C.S. §3215(c). To do this, the Department must have information at its disposal. Act 13 does not restrict how the Department should gather the information necessary to consider the impacts on public resources. Well applicants and public resource agencies have the knowledge and expertise about the public resources in the vicinity of the proposed well, the functions and uses of those public resources, and how those functions and uses may be impacted by drilling unconventional wells. *See* 25 Pa. Code §78a.15. Soliciting information from the well applicant and public resource agencies for consideration furthers the purpose of Act 13. It is only logical to enable the Department to acquire information necessary to perform its statutory duties.

To the extent the Coalition argues that the statutory language merely authorizes the Department to consider the impacts, but does not impose any new obligations on permit applicants, this argument fails. The General Assembly charged the Department with the duty of assessing impact to public resources. 58 Pa. C.S. §3215(c). Where additional information is necessary for the Department to carry out its statutory duties, the Department is acting within its discretion by seeking this information from the well applicant. Without this information, the Department's ability to consider the potential impacts to public resources would be severely hampered. Thus, we conclude that the Public Resource Regulations do not exceed statutory authority by authorizing the Department to seek information from well applicants and comments from public resource agencies as part of its impact consideration.

**b. Section 3215(e) of Act 13 – Criteria**

Next, we consider whether Section 78a.15(g) of the Chapter 78a Regulations fails to set forth criteria that the Department must consider in conditioning a well permit based on impacts to public resources as required by Section 3215(e). Although the General Assembly may authorize an agency to promulgate regulations to implement and fulfill the purpose of the statute, it must provide sufficient direction or parameters to the agency. *See U.S. Organizations for Bankruptcy Alternatives, Inc. v. Department of Banking*, 991 A.2d 370, 374 (Pa. Cmwlth. 2010), *appeal quashed*, 26 A.3d 474 (Pa. 2011). However, the General Assembly may not delegate authority in the absence of standards or restraints. *See id.* (regulation declared unconstitutional as a standard-less delegation of authority because the authorizing statute provided no standards or restraints on the agency's authority to set and regulate fees). "Due process requires that a statute give fair warning of its prohibition." *Boron v. Pulaski Township Board of Supervisors*, 960 A.2d 880, 886 (Pa. Cmwlth. 2008).

Indeed, this Court has set aside statutes and regulations as unconstitutionally vague where they leave people of ordinary intelligence guessing at their meanings. *See, e.g.*, *Whymeyer v. Commonwealth*, 997 A.2d 1254, 1259-60 (Pa. Cmwlth. 2010) (regulation requiring applicant to have graduated from an "approved engineering curriculum" of four or more years was unconstitutionally vague); *Boron*, 960 A.2d at 886 (ordinance held unconstitutionally vague because it did not define "state recognized holidays" or provide any guidance on how to determine when such holidays occur); *Watkins v. State Board of Dentistry*, 740 A.2d 760, 764 (Pa. Cmwlth. 1999) (regulation declared unconstitutionally vague because

it did not define "appropriate monitoring equipment," which was capable of more than one meaning).

By way of further example, our Supreme Court in *Robinson II* found Section 3215(b) unconstitutional because it failed to describe what additional measures were "necessary" for a waiver of setbacks to be appropriate. As the Court explained:

> what the crucial term "necessary" entails in the context of Section 3215(b) remains malleable and unpredictable. The statute does not provide any ascertainable standards by which public natural resources are to be protected if an oil and gas operator seeks a waiver of the Section 3215(b) setbacks. The statement of legislative intent, which simply articulates broad principles, offers no additional clarification regarding the environmental standard governing either the applicant or the [Department]. Moreover, Act 13 offers no reference, however oblique, to any requirement that the Department is obligated to consider the Commonwealth's environmental statutes in rendering its permit decisions or imposing well permit conditions under Act 13.

*Robinson II*, 83 A.3d at 983. Ultimately, the Supreme Court ruled that "the Section 3215(b) scheme lacks identifiable and readily-enforceable environmental standards for granting well permits or setback waivers, which yields at best arbitrary terms and conditions and, at worst, wholly ineffective protections for the waters of the Commonwealth." *Id.*

At issue here, Section 3215(e) directs the Board to develop regulation criteria for the Department to use in conditioning well permits based on the impact to public resources identified and for ensuring optimal development of oil and gas resources and respecting property rights of oil and gas owners.

25

58 Pa. C.S. §3215(e)(1). It also directs the Board to develop regulations for appeal of any condition imposed by the Department. 58 Pa. C.S. §3215(e)(2).

Pursuant to Section 78a.15(g) of the Chapter 78a Regulations, the Department will consider compliance with applicable statutes and regulations; proposed measures to avoid, minimize or otherwise mitigate impacts to public resources; other measures necessary to protect against a probable impact to the functions and uses of a public resource; comments and recommendations from public resource agencies; and the optimal development of gas resources and property rights. Subsection (g) more or less echoes the statutory language in Section 3215(e) as to what the Department shall consider prior to conditioning a well permit based on impacts to public resources. *Compare* 58 Pa. C.S. §3215(e) *with* 25 Pa. Code §78a.15(g). Although we understand the Coalition's desire to see more criteria in the regulations, the absence of additional criteria does not render the Public Resource Regulations illegal or void for vagueness. The regulation is simply a restatement or recitation of the statute. The Coalition does not argue that Section 3215(e) is unconstitutional. Therefore, we decline to invalidate the regulation as unconstitutionally vague on this basis.

### c. Rulemaking Procedures

As for the Coalition's rulemaking challenge, under the second criterion for review of regulations, we consider whether the regulation was issued pursuant to proper procedures. *Tire Jockey*, 915 A.2d at 1186. The Review Act requires governmental agencies to follow detailed procedures when they promulgate regulations. Agencies must develop an RAF under the Review Act to provide the IRRC with information necessary for its review. Section 5 of the Review Act, 71

P.S. §745.5. The RAF must include, *inter alia*, a citation to the statutory or regulatory authority, a statement of need, an economic impact statement, estimates of direct and indirect costs, identification of the financial impact, a description of the economic and social impact of the regulation on small businesses, and a description of the data upon which the regulation is based. *Id.* Proposed and final regulations from the Board must be submitted to the IRRC for review, recommendations, and approval or denial. Sections 5 and 5.1 of the Review Act, 71 P.S. §§745.5, 745.5a.

In addition, "[p]rior to submitting a proposed rulemaking, the agency head shall evaluate each regulation and attest to the fact that the regulation addresses a compelling public need that can be best remedied by the promulgation of the regulation." 4 Pa. Code §1.374(a). This rule also requires that the agency submit a cost/benefit analysis of the regulation, non-regulatory alternatives considered and the reasons for their dismissal, and any requirements that would place the Commonwealth at a competitive disadvantage compared to other states. 4 Pa. Code §1.374(b)(13), (14), (17). A regulation that does not comply with the Review Act is invalid. *See Bedford v. Commonwealth*, 972 A.2d 53, 62 (Pa. Cmwlth. 2009) (holding that "an agency's regulation must also undergo legislative scrutiny in accordance with the . . . Review Act" and the "effect of an agency's failure to promulgate a regulation in accordance with these various statutory requirements is to have the regulation declared a nullity"); *Physicians Insurance Co. v. Callahan*, 648 A.2d 608, 617 (Pa. Cmwlth. 1994) (declaring invalid a regulation promulgated in violation of the Documents Law and Review Act).

In *Bedford*, the petitioner challenged a Department policy on the basis that it did not go through the rulemaking process. *Bedford* clearly holds that a regulation must undergo the regulatory review process to be valid. *Bedford*,

27

972 A.2d at 62.  However, *Bedford* does not stand for the proposition that a party may challenge the validity of a regulation based on the sufficiency of information submitted to the IRRC pursuant to the Review Act.  *See id.*  Indeed, Section 745.2(d) of the Review Act provides, "This act is not intended to create a right or benefit, substantive or procedural, enforceable at law by a person against another person or against the Commonwealth, its agencies or its officers."  Section 2(d) of the Review Act, 71 P.S. §745.2(d).

Here, the Department developed the RAF under the Review Act and provided the IRRC with the information necessary for its review.  The RAF includes the statutory authority for the regulation and a statement of need.  Commonwealth Court Preliminary Injunction Hearing, Stipulated Hearing Exhibit No. 2 at 5 (RAF).  With respect to cost estimates for mitigation measures, the Department asserted in the RAF that the identification of public resources and coordination with public resource agencies would impose new costs of over $800,000 annually.  With regard to mitigation, the RAF provides:

> The final step in the process is mitigation.  *The cost estimate for mitigation will vary*.  In some circumstances, an operator may be able to plan the location of the well site using the planning tool discussed above to avoid public resources resulting in *zero cost.  Any cost associated with mitigation measures is dependent on many variables* and may be situation specific in some cases.  While the Department is unable to provide a specific estimate for the implementation of this entire provision, it should be noted that *this cost may be substantial depending on the location of the well site*.

*Id.* at 87 (emphasis added).

The Coalition takes issue with the fact that the Department did not provide a specific estimate for the cost of mitigation.  On this basis, the Coalition

28

maintains that the Public Resource Regulations were not properly promulgated and are, therefore, invalid. Although the Department did not set forth a specific estimate, it did provide a general estimate of the cost of compliance, *i.e.*, from "zero" to "substantial" depending on the situation. *Id.* As the Department explained in the RAF, the costs associated with mitigation measures will vary from case to case. *Id.* The Department further explained that, in some circumstances, an operator may be able to plan the location of the well using the Pennsylvania Conservation Explorer's online planning tool, a tool that allows operators to identify the location of the majority of public resources listed in Section 78a.15(f)(1), and site their operations so as to avoid public resources with zero costs. *Id.* at 86-87, 107-08. There is no evidence to suggest that the IRRC's review of the Public Resource Regulations was in any way thwarted by the lack of a more specific cost estimate. Thus, we conclude there is no clear right to relief on this point. For these reasons, we decline to declare the permitting process devised under Section 78a.15(f) and (g) invalid and unenforceable.

### C. "Other Critical Communities"
#### 1. Contentions

Next, the Coalition contends that Section 78a.15(f)(1)(iv)'s requirement to identify and provide information concerning "other critical communities" as defined in Section 78a.1 is unlawful and unenforceable. The term "other critical communities," which was in the predecessor to Act 13, remained unchanged and undefined in Act 13. The regulations now define "other critical communities," for the first time, to include any "species of special concern" as identified on a PNDI receipt. 25 Pa. Code §78a.1. The phrase "species of special concern" is not contained within or authorized by Act 13. The special concern

29

species provisions bypass the Documents Law's formal notice and comment rulemaking process. In addition, the special concern species provisions violate the prohibition against special laws contained in Article III, Section 32 of the Pennsylvania Constitution and the Documents Law. Finally, the Coalition asserts that the Agencies lack jurisdiction over species of special concern; the PNDI receipt is managed by the Department of Conservation and Natural Resources (DCNR), not by the Agencies.

The Agencies respond that the broad scope of Act 13 supports protection of species of special concern. Section 3215(c) clearly intends to include more than simply "threatened" species. The term "threatened" has a particular legal meaning. The General Assembly chose not to use that term in Section 3215, and instead opted for the more expansive term of "other critical communities." To conclude otherwise treats the phrase "other critical communities" as mere surplusage, which is contrary to the principles of statutory interpretation. Moreover, the regulatory definition of "other critical communities" manifests the Department's past practices and policies and codifies the process used prior to the adoption of the regulation. Defining "other critical communities" as "species of special concern" does not create a special law prohibited by Article III, Section 32 of the Pennsylvania Constitution. Contrary to the Coalition's assertions, the Public Resource Regulations do not treat the unconventional gas industry as a special class, *i.e.*, the only earth-disturbance industry for which the Department considers impacts upon species other than those that are threatened or endangered. Other regulatory programs protect special concern species beyond those classified as threatened and endangered. Further, "species of special concern" does not violate the Documents Law because the General Assembly intended no such restraint on the consideration

30

of public resources.  Finally, although the Agencies may lack jurisdiction over the species of special concern, the Agencies are constitutionally and statutorily charged with protecting public resources.

## 2. Analysis
### a. Statutory Authority

The statutory concept of "public resources" embodied in Act 13 and the Public Resource Regulations derives from Article I, Section 27 of the Pennsylvania Constitution, which provides:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values in the environment.  Pennsylvania's public natural resources are the common property of all the people, including generations yet to come.  As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. art. I, §27; *see Pennsylvania Environmental Defense Foundation v. Commonwealth*, 161 A.3d 911, 931-32 (Pa. 2017) (*PEDF*) (discussing this constitutional provision); *see also* 58 Pa. C.S. §3202(4) (stating that the purpose of Act 13 is to "[p]rotect the natural resources, environmental rights and values secured by the Constitution of Pennsylvania").  Section 27 establishes a common law trust, with the Commonwealth as trustee and the public natural resources managed by the Commonwealth as the corpus of the trust.  *PEDF*, 161 A.3d at 931; *see Robinson II*, 83 A.3d at 980.  The trustee is obligated to conserve, maintain and manage the corpus of the trust for the benefit of the trust's beneficiaries – the people.  *PEDF*, 161 A.3d at 932; *see Robinson II*, 83 A.3d at 980.

As the plurality of the Pennsylvania Supreme Court opined in *Robinson II*, the constitutional concept of "public natural resources" includes:

31

not only state-owned lands, waterways, and mineral reserves, but also *resources that implicate the public interest*, such as ambient air, surface and ground water, *wild flora, and fauna* (including fish) that are outside the scope of purely private property.

*Robinson II*, 83 A.3d 901, 955 (emphasis added). "[T]he concept of public natural resources [is] flexible to capture the full array of resources implicating the public interest, as these may be defined by statute or at common law." *Id.* at 955.

In furtherance of its trustee duties, the General Assembly directed the Department to consider impacts of a proposed well on "public resources" when determining whether to grant a well permit or add permit conditions to avoid potentially negative impacts from fracking activities. 58 Pa. C.S. §3215(c). Section 3215(c) of Act 13 identifies, with emphasis added, "public resources" as "including, but not limited to . . . habitats of rare and endangered flora and fauna *and other critical communities*." *Id.* However, Act 13 does not define the term "other critical communities." *See* Section 3203 of Act 13, 58 Pa. C.S. §3203 (Definitions).

Section 78a.1 of the Chapter 78a Regulations defines "other critical communities," for the first time, to include any "species of special concern" as identified through the PNDI. 25 Pa. Code §78a.1. "Species of special concern" includes species categorized as "proposed endangered, proposed threatened, proposed rare or candidate" and "classified as rare or tentatively undetermined." *Id.* The Department's Policy for PNDI Coordination During Permit Review and Evaluation, Document No. 021-0200-011, dated May 25, 2013 (2013 PNDI Policy),[20] defines "species of special concern" as:

---

[20] The 2013 PNDI Policy is available on the Department's website at: http://www.gis.dcnr.state.pa.us/PNDI/021-0200-001%20PNDI%20Policy.pdf (last visited July 30, 2018). The policy is also attached to the Petitioner's Brief as Appendix C.

Plant and animal species that are *not listed as threatened or endangered by a jurisdictional agency*, but are identified on a PNDI Receipt as an at risk species. These include: (1) plant and animal species that are classified as rare, vulnerable, tentatively undetermined or candidate, (2) taxa of conservation concern and (3) special concern plant populations.

2013 PNDI Policy at 1 (emphasis added).[21]

What the General Assembly meant by "other critical communities" and whether the regulatory definition of this term exceeds the scope of the statute is a matter of statutory construction. Accordingly, we turn to the Statutory Construction Act of 1972 (Statutory Construction Act)[22] for guidance, which applies to statutes and regulations alike. *Bayada Nurses, Inc. v. Department of Labor and Industry*, 958 A.2d 1050, 1055 (Pa. Cmwlth. 2008), *aff'd*, 8 A.3d 866 (Pa. 2010).

The object of statutory construction is to ascertain and effectuate legislative intent. Section 1921(a) of the Statutory Construction Act, 1 Pa. C.S. §1921(a); *Whitmoyer v. Workers' Compensation Appeal Board (Mountain Country Meats)*, 186 A.3d 947, 954 (Pa. 2018). In pursuing that end, we are mindful that a statute's plain language generally provides the best indication of legislative intent. *Id.*; *see Commonwealth v. McClintic*, 909 A.2d 1241, 1243 (Pa. 2006). Thus, statutory construction begins with an examination of the text itself.

---

[21] PNDI is managed by DCNR. DCNR, along with other jurisdictional agencies (the Pennsylvania Fish and Boat Commission, the Pennsylvania Game Commission, and the Pennsylvania Office of the Fish and Wildlife Service) populate the database with special concern species. *See* 2013 PNDI Policy at 1. The special concern species list is available on the Pennsylvania Natural Heritage Program (PNHP) website at: http://www.naturalheritage.state.pa.us/docs/pndi_specieslist_Jan2014.pdf (last visited July 30, 2018). *See* Petitioner's Brief, Appendices E (PNHP Species List as of January 28, 2014) and F (Department's Response to the Coalition's First Set of Requests for Admissions, at No. 7).

[22] 1 Pa. C.S. §§1501-1991.

33

*Southeastern Pennsylvania Transportation Authority v. Holmes*, 835 A.2d 851, 856 (Pa. Cmwlth.), *appeal denied*, 848 A.2d 930 (Pa. 2003).

"[W]e are instructed to give the statute its obvious meaning whenever the language is clear and unambiguous." *Whitmoyer*, 186 A.3d at 954 (citing 1 Pa. C.S. §1921(b)). "To that end, we will construe words and phrases according to their common and approved usage." *Id.* (citing Section 1903 of the Statutory Construction Act, 1 Pa. C.S. §1903(a)). "Further, every statute shall be construed, if possible, to give effect to all its provisions so that no provision is 'mere surplusage.'" *Id.* (citing 1 Pa. C.S. §1921(a)); *Malt Beverage Distributors Association v. Pennsylvania Liquor Control Board*, 918 A.2d 171, 175-76 (Pa. Cmwlth. 2007), *aff'd*, 974 A.2d 1144 (Pa. 2009). "In addition, in determining whether language is clear and unambiguous, we must assess it in the context of the overall statutory scheme, construing all sections with reference to each other, not simply examining language in isolation." *Whitmoyer*, 186 A.3d at 954.

If the language is clear and unambiguous, it must be applied. *See id.*; 1 Pa. C.S. §1921(b). If, however, the language is "not explicit" or ambiguous, we may look to considerations beyond the text such as the occasion and necessity for the statute, the mischief to be remedied, the former law, including other statutes upon the same or similar subjects, and the consequences of a particular interpretation. 1 Pa. C.S. §1921(c); *see Whitmoyer*, 186 A.3d at 954. Moreover, we are to assume the General Assembly did not intend a result that is "absurd, impossible of execution or unreasonable." Section 1922(1) of the Statutory Construction Act, 1 Pa. C.S. §1922(1).

Generally, "an administrative agency's interpretation of a statute for which it has enforcement responsibility is entitled to substantial deference." *Malt*

*Beverage*, 918 A.2d at 176 (quoting *Pottstown*, 712 A.2d at 744). However, where an administrative interpretation is clearly erroneous, inconsistent with the statute itself under which it was promulgated, or where the statute's meaning is unambiguous, such an interpretation carries little or no weight and may be disregarded. *Terminato v. Pennsylvania National Insurance Co.*, 645 A.2d 1287, 1293 (Pa. 1994); *Malt Beverage*, 918 A.2d at 176.

We are also guided by the doctrine of *ejusdem generis*, which means "of the same kind or class." *Department of Environmental Protection v. Cumberland Coal Resources, LP*, 102 A.3d 962, 976 (Pa. 2014). This doctrine provides that when general expressions such as "including" or "including, but not limited to" precede a list of specific items, the general words are to be interpreted as "words of enlargement and not limitation." *Id.* When interpreting a non-exhaustive statutory list, "any additional matters purportedly falling within the definition, but that are not express, must be similar to those listed by the legislature and of the same general class or nature." *Id.* However, items that are not of the same general nature or class as those enumerated should not be included. *Id.* The critical inquiry is whether items are of the "same general class or nature" as the included items. *Id.*

Applying these tenets of statutory construction here, we first examine the plain language of a statute and construe words and phrases according to rules of grammar and according to their common and approved usage. 1 Pa. C.S. §1903(a); *Whitmoyer*, 186 A.3d at 954. In determining the common and approved usage or meaning of undefined statutory terms, courts may turn to standard dictionary definitions. *SugarHouse HSP Gaming, L.P. v. Pennsylvania Gaming Control Board*, 162 A.3d 353, 376 (Pa. 2017); *In re Beyer*, 115 A.3d 835, 839 (Pa. 2015).

Section 3215(c) of Act 13 identifies "public resources" as "including, but not limited to . . . . habitats of rare and endangered flora and fauna *and other critical communities*" – terms not defined by Act 13. 58 Pa. C.S. §3215(c). Within the context of the statute, the key modifiers of the specified items are "rare," "endangered" and "critical." Applying common and approved usage to these terms, within the context in which they appear, "rare" means "seldom occurring or found"; "endangered" means "threatened with extinction"; and "critical" means "being in or approaching a state of crisis <a ~ shortage . . . >." Merriam-Webster's Collegiate Dictionary 307, 410, 976 (9th ed. 1987).

In other statutory contexts dealing with the protection of the environment and public resources, the terms "rare" and "endangered" are assigned particular legal meanings or given special classifications. For instance, in Section 102 of the Pennsylvania Fish and Boat Code, "endangered species" are species which have been declared to be "threatened with extinction" by the federal or state jurisdictional agency and appear on the published endangered species lists. 30 Pa. C.S. §102. Similarly, under the Section 1532(6) of the federal Endangered Species Act, "[t]he term 'endangered species' means any species which is in danger of extinction throughout all or a significant portion of its range . . . ." 16 U.S.C. §1532(6). Under Section 7 of the Pennsylvania Wild Resource Conservation Act, the term "rare" refers to species that are uncommon because they are at or near the peripheral of their distribution. Act of June 23, 1982, P.L. 597, 32 P.S. §5307.

Although the term "other critical communities" is not referenced or defined in other statutory contexts, the term "critical habitat" is. Section 7 of the Wild Resource Conservation Act provides that endangered species are in danger of extinction and threatened species are likely to become endangered "throughout all

36

or most of its range if *critical habitat* is not maintained or is greatly exploited by man." 32 P.S. §5307 (emphasis added). In addition, under Section 8 of the Keystone Recreation, Park and Conservation Fund Act, the Department of Community Affairs, in consultation with the Department, "shall adopt project selection criteria that give priority to acquisitions of critical habitat for rare, threatened or endangered plant or animal species or *communities which are at risk of destruction or substantial degradation*." Act of July 2, 1993, P.L. 359, 32 P.S. §2018 (emphasis added).

Section (5)(A) of the federal Endangered Species Act defines the term "critical habitat" for "threatened or endangered species" as:

> (i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and
>
> (ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. §1532(5)(A).

Although the General Assembly did not define "other critical communities," the text and context of Section 3215(c) of Act 13, as well as the General Assembly's other statutory pronouncements, suggest the foregoing meaning. When used to describe flora and fauna, the implication is that these species are *at risk of destruction or substantial degradation* warranting consideration and more active management to preserve and protect the species for the benefit of all the people. *See* 58 Pa. C.S. §3215(c); *see also* Section 5302 of the Wild Resource

37

Conservation Act, 32 P.S. §5302 (providing legislative findings pertaining to rare or endangered flora and fauna).

Applying the doctrine of *ejusdem generis*, we examine whether the regulatory term "species of special concern" is of the same general nature or class as the statutory items listed. According to common and approved usage, the term "concern" ordinarily describes something of "marked interest" or "importance," "a matter for consideration." Merriam-Webster's Collegiate Dictionary at 272. Even when enhanced by the word "special," the regulatory term is not quite on par with the statute's terms of "rare," "endangered," and "critical." According to the regulation itself, a species of special concern refers to species that are "proposed" to be endangered or threatened, or their status is undetermined. *Id.* Within that context, a species of special concern represents a less imminent or potential conservation threat, *i.e.*, something *proposed to be at risk*, certainly worthy of monitoring by jurisdictional agencies, but perhaps not at imminent risk warranting heightened conservation measures. It does not appear that "species of special concern" is of the same general nature or class as the statutory items listed. Therefore, the question remains, what did the General Assembly intend by "other critical communities."

Notably, Section 3215(c) of Act 13 does not include the term "threatened" species in the list of items. "Threatened" means "to give signs or warning of" . . . "to announce as intended or possible." Merriam-Webster's Collegiate Dictionary at 1229. Both federal and state law define "threatened species." Under the federal statute, the term "'threatened species' means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. §1532(20). Under

Pennsylvania law, Section 102 of the Game and Wildlife Code similarly defines "threatened species" as:

> All species and subspecies of wildlife which have been declared by:
>
> (1) the Secretary of the United States Department of the Interior to be in such small numbers throughout their range that they may become endangered if their environment worsens and appear on a Threatened Species List published in the Federal Register; or
>
> (2) the director to be in such small numbers throughout their range that they may become endangered if their environment worsens and appear on the Pennsylvania Threatened Species List published in the Pennsylvania Bulletin.

34 Pa. C.S. §102; *see also* Section 102 of the Fish and Boat Code, 30 Pa. C.S. §102 (similarly defining the term as it relates to "[a]ll species and subspecies of fish").

The Coalition argues that the General Assembly surely intended threatened species to fall within the category of "other critical communities." The Agencies counter that the General Assembly, by deliberately not using the term "threatened species," intended for "other critical communities" to mean something else. The Agencies argue their interpretation is logical because the Department "commonly requires permit applicants in other environmental permitting programs to consider and mitigate potential impacts to species *other than threatened or endangered*." Respondents' Brief at 11. In support, the Agencies cite examples from regulations pertaining to surface mining of coal, 25 Pa. Code Chapters 86-90, dam safety and waterway management, 25 Pa. Code Chapter 105, and municipal waste management, 25 Pa. Code Chapter 271. *Id.*; *see, e.g.*, 25 Pa. Code §87.84 ("An application shall include a description of how, to the extent possible using the

39

best technology currently available, the operator will minimize disturbances and adverse impacts on fish and wildlife and related environmental values. . . ."); 25 Pa. Code §105.13(e)(1)(x) (requiring detailed analysis of potential impacts to "fish and wildlife"); 25 Pa. Code §271.127 ("Each environmental assessment in a permit application shall include at a minimum a detailed analysis of the potential impact of the proposed facility on the environment, public health and public safety, including traffic, aesthetics, air quality, water quality, stream flow, fish and wildlife, plants, aquatic habitat, threatened or endangered species, water uses, land use and municipal waste plans. . . .").

However, the General Assembly clearly authorized the protection of species other than threatened or endangered in the enabling statutes. *See* Section 1 of the Surface Mining Conservation and Reclamation Act, Act of May 31, 1945, P.L. 1198, *as amended*, 52 P.S. §1396.1 (purpose of the act is to provide for the protection of wildlife and the environment in general and prevent pollution of rivers and streams from surface mining); Section 4(a)(2) of the Surface Mining Conservation and Reclamation Act, 52 P.S. §1396.4(a)(2) (applications must include reclamation plan including a statement of the land use proposed after mining and reclamation are completed, which will not be approved unless the application demonstrates that the use does "not present any actual or potential threat to public health or safety or to fish and wildlife"); Section 9 of the Dam Safety and Encroachments Act, Act of November 26, 1978, P.L. 325, *as amended*, 32 P.S. §693.9 (the Department shall have the power to grant a permit if the proposal complies with all other applicable laws administered by the Department, the Pennsylvania Fish Commission and any river basin commission or may impose such terms and conditions as necessary to assure compliance); Section 105 of

40

Pennsylvania Solid Waste Management Act, Act of July 7, 1980, P.L. 380, *as amended*, 35 P.S. §6018.105 (the Board shall have the power to adopt "regulations relating to the protection of safety, health, welfare and property of the public and the air, water and other natural resources of the Commonwealth"); Section 502 of the Solid Waste Management Act, 35 P.S. §6018.502 (applications must set forth the manner in which the operator plans to comply with enumerated environmental laws). In contrast, the General Assembly has not made it clear that it intended to protect non-threatened or non-endangered "species of special concern" in Act 13.

Furthermore, the Agencies' proffered interpretation does not protect threatened species. The regulatory definition of "other critical communities" expressly omits "threatened species." *See* 25 Pa. Code §78a.1(ii) (the term "other critical communities" does *not* include "threatened . . . species"). Under the Agencies' interpretation, the Department must consider impacts to rare and endangered species and species of "special concern," but not "threatened" species. Such an interpretation is illogical and seems contrary to the intention of the General Assembly to protect *at risk* species. Clearly, the General Assembly intended to protect threatened species in the context of "other critical communities."

Moreover, under the doctrine of *ejusdem generis*, "threatened" is a category of species listed by public rulemaking that aligns with categories of "rare" and "endangered" species and "critical habitats" as defined by state and federal law. Threatened species are of "the same general nature or class" as habitats of rare and endangered flora and fauna. However, species of special concern, which are not endangered or threatened species, but are in *proposed status or tentatively*

41

*undetermined*, are not.[23]  In essence, a "species of special concern" is a resource classification that falls below endangered or threatened species.  The General Assembly clearly intended the term "other critical communities" to be on par with "rare" or "endangered" species.  "Threatened" species fits the bill.[24]

As discussed more fully below, endangered and threatened species are the result of public rulemaking and have special protection afforded under the laws of this Commonwealth that the Department is entrusted to enforce.  Such is not the case with species of special concern.  For these reasons, we conclude that species of special concern are not within the same nature or class as endangered and threatened species.

This interpretation is logical when one considers the purpose of Act 13 and the balance that must be struck between oil and gas and environmental interests.  Indeed, the purpose of Act 13 is to permit the optimal development of oil and gas resources in this Commonwealth consistent with the protection of the health, safety, natural resources, environment and property of the citizenry.  58 Pa. C.S. §3202;[25]

---

[23] The General Assembly's use of the phrase "other critical communities" leaves room for other classifications of imperiled species of the same ilk.

[24] We note that the term "other critical communities" is not limited to "threatened" species, but is broad enough to include prospective classifications of at risk species.

[25] Section 3202 of Act 13 provides:

> (1) Permit optimal development of oil and gas resources of this Commonwealth consistent with protection of the health, safety, environment and property of Pennsylvania citizens.
>
> (2) Protect the safety of personnel and facilities employed in coal mining or exploration, development, storage and production of natural gas or oil.

*Pennsylvania Independent Petroleum Producers v. Department of Environmental Resources*, 525 A.2d 829, 832 (Pa. Cmwlth. 1987), *aff'd*, 550 A.2d 195 (Pa. 1988), *cert. denied*, 489 U.S. 1096 (1989).  In achieving this balance, our Supreme Court emphasized that "economic development cannot take place at the expense of an unreasonable degradation of the environment."  *Robinson II*, 83 A.3d at 954-55.  However, "the trust's express directions to conserve and maintain public natural resources do not require a freeze of the existing public natural resource stock; rather, as with the rights affirmed by the first clause of Section 27 [(relating to the Environmental Rights Amendment)], the duties to conserve and maintain are tempered by legitimate development tending to improve upon the lot of Pennsylvania's citizenry, with the evident goal of promoting sustainable development."  *Robinson II*, 83 A.3d at 958; *see also Robinson II*, 83 A.3d at 1015 (Eakin, J., dissenting) ("The challenge is one of balancing the competing interests of local and individual economic prosperity, national need for energy and a desire for independence from foreign energy, and the unavoidable environmental impact of taking and using any resource from the ground.").  By creating obligations tied to species of special concern, which are not at the same level of risk as threatened or endangered species, the regulation upsets the balance between industry and the environment strived for in Act 13.

---

(3) Protect the safety and property rights of persons residing in areas where mining, exploration, development, storage or production occurs.

(4) Protect the natural resources, environmental rights and values secured by the Constitution of Pennsylvania.

58 Pa. C.S. §3202.

43

By defining "other critical communities" to include "species of special concern," Section 78a.1 of the Chapter 78a Regulations expands upon the list of public resources identified in Section 3215(c) and does not track the statute. *See Bailey*, 801 A.2d at 500. Had the General Assembly intended for "other critical communities" to include "species of concern" as listed on the PNDI list, it could have drafted the statute accordingly. It did not. Absent statutory authority for "species of concern," as identified on the PNDI, we conclude that the regulation exceeds the scope and purpose of Act 13 and is unenforceable.

### b. Documents Law

As to the Coalition's rulemaking challenge, the Documents Law requires agencies to promulgate regulations through formal notice and comment procedures in order to have the force and effect of law. Sections 201 and 202 of the Documents Law, 45 P.S. §§1201, 1202; *Hillcrest Home v. Department of Public Welfare*, 553 A.2d 1037, 1040 (Pa. Cmwlth.), *appeal denied*, 563 A.2d 500 (Pa. 1989). "The process by which regulations are promulgated provides an important safeguard against the unwise or improper exercise of discretionary administrative power and includes public notice of a proposed rule, request for written comments, consideration of such comments, and hearings as appropriate." *Commonwealth v. Colonial Nissan, Inc.*, 691 A.2d 1005, 1009 (Pa. Cmwlth. 1997). Regulations that bypass the Documents Law's notice and comment requirements "are a nullity." *Automotive Service Councils of Pennsylvania v. Larson*, 474 A.2d 404, 405 (Pa. Cmwlth. 1984). As our Supreme Court has summarized:

> Commonwealth agencies have no inherent power to make law or otherwise bind the public or regulated entities. Rather, an administrative agency may do so only in the fashion authorized by the General Assembly, which is, as

44

> a general rule, by way of recourse to procedures prescribed in the . . . Documents Law, the . . . Review Act, and the Commonwealth Attorneys Act. When an agency acts under the general rule and promulgates published regulations through the formal notice, comment, and review procedures prescribed in those enactments, its resulting pronouncements are accorded the force of law and are thus denominated "legislative rules."

*Northwestern Youth Services v. Department of Public Welfare*, 66 A.3d 301, 310 (Pa. 2013).

Here, the requirements related to "species of special concern" identified on a PNDI receipt violate the Documents Law because they create a binding norm through a changing PNDI database that is not populated through notice and comment rulemaking procedures. Threatened and endangered species are subject to formal notice and comment and regulatory review procedures. Commonwealth Court Preliminary Injunction Hearing, 10/25/16, Notes of Testimony (N.T.) at 153. However, the PNDI database includes resources that have not gone through formal notice and comment rulemaking. *Id.* The provisions tied to the PNDI receipt effectively allow third parties to make changes to the regulation without meeting the requirements of formal rulemaking. Indeed, species of special concern are placed in the PNDI database and designated as such by the jurisdictional agencies, that is, the agencies with "statutory authority to protect those species," including DCNR, the Game Commission, the Fish and Boat Commission, and the Pennsylvania field office of the United States Fish and Wildlife Service. *Id.* at 153-54.

Scott Perry, the Department's Secretary for the Office of Oil and Gas Management, testified at the preliminary injunction hearing that the rule requiring consideration of species, which are neither endangered nor threatened, was adopted in 2013 pursuant to a departmental policy. *See id.* at 152-54, 159-60. Perry further testified that the Department uses the PNDI database in its efforts to consider impacts

on protected public resources, specifically to "require a minimal consultation process with agencies that are protecting resources that have been deemed appropriate for additional protection." N.T. at 158.

The insertion of obligations tied to an ever-changing list of species creates requirements that evolve over time while evading public notice and comment rulemaking. By utilizing the PNDI database to protect species of special concern, the Agencies have inappropriately subverted rulemaking formalities by engaging in policymaking through non-legislative avenues. *See Northwestern Youth*, 66 A.3d at 314. We, therefore, conclude that the special concern species provisions are unlawful because they bypass the Documents Law's notice and comment requirements.

Having concluded that the regulatory definition of "other critical communities" is at odds with Act 13 and violates the Documents Law, we declare that the regulatory definition of "other critical communities" as including "species of special concern" as listed on the PNDI database is void and unenforceable.[26]

### D. "Common Areas of a School's Property and a Playground"
#### 1. Contentions

Next, the Coalition contends that the requirement in Section 78a.15(f)(1)(vi) to identify and provide information concerning "common areas of a school's property or a playground" in a well permit application as well as the definition of these terms in Section 78a.1 is unlawful and unenforceable. The Coalition claims that common areas of a school's property and playgrounds are not

---

[26] In light of this disposition, we will not address the Coalition's claims that the definition of "other critical communities" violates Article III, Section 32 of the Pennsylvania Constitution or that the Agencies lack jurisdiction over "species of special concern."

of the same kind or class of public resources contained in the statutory list because these areas may be located on private property. Private property is not a "public resource" of the Commonwealth. In addition, the definition of school is so broad that virtually any institution qualifies, including career and technical centers, community colleges, driver training schools, and theological seminaries. The Coalition asserts that the number of qualifying resources is "unlimited, unknown and unknowable," rendering the regulation overly broad and unenforceable. Petitioner's Brief at 51.

The Coalition further contends that the term "playground" suffers from the same flaws. Under the regulatory definition, even a playground at a McDonald's restaurant qualifies as a "public resource" if it includes an outdoor area provided to the general public for recreational purposes. The definition would also include community playgrounds, like a homeowners' association area that is open to the public. Both regulatory definitions include thousands of private properties owned by private entities that are not "public resources" as contemplated by the constitution or Act 13. Surely, this is not what the General Assembly envisioned as "public resources" in Section 3215(c) of Act 13.

The Agencies respond that "common areas of a school's property or playground" are of the same class or nature as the items listed in Section 3215(c). The inclusion of these areas is appropriate because they are used in a manner similar to how the general public uses publicly owned parks. These areas are only considered if the general public has access to them for recreational purposes. The Coalition's argument that common areas of a school's property or playgrounds cannot be public resources because they are privately owned property misses the mark. Many of the public resources included in Act 13 are, in fact, located on

47

privately owned property. As for the Coalition's argument that the number of such resources is "unknown or unknowable" and not compiled on any known list, a list is not necessary because these resources are visually identifiable. A permit applicant need only look 200 feet from its proposed limit of disturbance to see whether a neighboring feature may fit the definition of a playground or common area of a school that is open to the public. Any argument that doing this is burdensome is simply ludicrous.

## 2. Analysis
## Statutory Authority

Section 3215(c) of Act 13 identifies "public resources" as "including, but not limited to:"

> (1) publicly owned parks, forests, game lands and wildlife areas; (2) national or State scenic rivers; (3) national natural landmarks; (4) habitats of rare and endangered flora and fauna and other critical communities; (5) historical and archaeological sites listed on the Federal or State list of historic places . . . .[27]

58 Pa. C.S. §3215(c). These public resources are of the same general class or nature in that they are all public in nature, albeit not necessarily publicly owned. Indeed, some items on the list, such as buildings on the historic register and habitats of rare and endangered species, may be located on privately owned property, but they are not purely private property. *See Robinson II*, 83 A.3d at 955. What makes them "public" is the fact that these resources "implicate the public interest," thereby triggering protection under the Pennsylvania Constitution. *See Robinson II*, 83 A.3d at 955.

---

[27] Section 3215(c) also included "(6) sources used for public drinking supplies in accordance with subsection (b)," which the Supreme Court held unconstitutional in *Robinson II*.

48

Article I, Section 27 of the Pennsylvania Constitution secures "the right to enjoy public natural resources and to not be harmed by the effects of environmental degradation now and in the future . . . ." *Funk v. Wolf*, 144 A.3d 228, 248 (Pa. Cmwlth. 2016), *aff'd*, 158 A.3d 642 (Pa. 2017). "The explicit terms of the trust require the government to 'conserve and maintain' the corpus of the trust." *PEDF*, 161 A.3d at 932 (quoting *Robinson II*, 83 A.3d at 957); *see* Pa. Const. art. I, §27. "The plain meaning of the terms conserve and maintain implicates a duty to prevent and remedy the degradation, diminution, or depletion of our public natural resources." *PEDF*, 161 A.3d at 932 (quoting *Robinson II*, 83 A.3d at 957). "As a fiduciary, the Commonwealth has a duty to act toward the corpus of the trust–the public natural resources–with prudence, loyalty, and impartiality." *Id.* (quoting *Robinson II*, 83 A.3d at 957).

Pursuant to various statutes, the public resources listed in Act 13 are "managed," *i.e.*, monitored, regulated, and/or protected, by some government entity to ensure their conservation and maintenance for the benefit of all the people. These public resources are also readily identifiable because they are indexed or cataloged by government agencies and made public on the internet. For instance, DCNR maintains a list of publicly-owned parks, forests, wildlife areas, and scenic rivers in Pennsylvania. The Pennsylvania Game Commission maintains a list of state game lands. Through federal and state legislation, certain segments of Commonwealth waterways have been designated as "scenic rivers." The National Park Service maintains a list of national natural landmarks. The Pennsylvania Game Commission identifies threatened, endangered and at-risk wildlife species. DCNR maintains a list of rare, threatened and endangered plants. DCNR also maintains a list of historical and archaeological sites listed on the Federal or State list of historic places.

49

The Department provides a Pennsylvania Conservation Explorer's online planning tool,[28] which allows operators to identify the location of the majority of public resources listed in Act 13. *See* 46 Pa. B. 6464 (2016); Commonwealth Court Preliminary Injunction Hearing, Stipulated Hearing Exhibit No. 2 at 86-87 ("This tool will allow operators to identify potential impacts to threatened and endangered species . . . ."). There is also a National Register of Historic Places.

The Public Resource Regulations expand the list by creating a new class of "public resources." The regulation includes the places identified in the statute, but it adds "common areas of a school's property" and "playgrounds" to the list of "public resources." 25 Pa. Code §78a.15(f)(1). The regulation requires well applicants to identify and provide information on "common areas of a school's property" and "playgrounds" located within 200 feet of the proposed well location in addition to the other listed "public resources." 25 Pa. Code §78a.15(f)(1).

Section 78a.1 defines "common areas of a school's property" as "[a]n area on a school's property accessible to the general public for recreational purposes. For the purposes of this definition, a school is a facility providing elementary, secondary or postsecondary educational services." 25 Pa. Code §78a.1. According to the Department's interpretation, the term "school" is a "facility providing elementary, secondary, or postsecondary educational services" that has "outdoor facilities accessible to the general public for recreational purposes." *See* Petitioner's Brief, Appendix G at No. 15 (Department's Response to the Coalition's First Set of Interrogatories). The regulation defines "playground" as "(i) An outdoor area provided to the general public for recreational purposes. (ii) The term includes community-operated recreational facilities." 25 Pa. Code §78a.1.

---

[28] The planning tool is found at: https://conservationexplorer.dcnr.pa.gov/content/Map (last visited July 30, 2018).

The Coalition contends that these definitions exceed the scope of the statute by including purely private places that do not constitute public resources and that the regulatory additions to public resources are not of the same class or nature as the statutory items. The Agencies assert that common areas of a school's property and playgrounds share many of the inherent features as publicly-owned parks and forests, or even National or State scenic rivers, that make them public resources worthy of the Department's consideration in the permitting process. Respondents' Brief at 22. According to the Agencies, common areas of a school's property and playgrounds are used by the general public for recreational purposes in a manner similar to how the general public uses publicly owned parks. *Id.* at 24. In other words, any area that the general public has access to for recreational purposes is a public resource that must be identified on a well permit application. *Id.* As the Agencies further explain, the definitions of "common areas of a school's property" and "playground" make it clear that the impact on these areas is to be considered only when the general public has open access to them for recreational purposes. *Id.*

Although common areas of a school's property and playgrounds may share some similarities with the public resources listed in Section 3215(c), we agree with the Coalition that they are not within the "same general class or nature as" their statutory counterparts. With regard to schools, virtually any school would fall within the definition of "school," such as career and technical centers, culinary schools, charter schools, community colleges, private-licensed school, driver-training school, vocational schools, etc. The list is seemingly endless as any institution providing some form of educational services would ostensibly qualify as a "school" under the regulatory definition. As for the recreational aspect, a mere picnic table and bench

51

or basketball hoop accessible to the public would bring the school's property within the purview of the regulation.

As for playgrounds, again the definition is so broad as to defy quantification and compliance. The definition embraces publicly and privately owned "playgrounds." It obviously includes children's playgrounds, sports fields, and picnic sites. However, it also includes virtually any area open to the public for recreational purposes, including commercial enterprises, such as shopping centers, movie theaters, sports stadiums, amusement parks, and golf courses. Even a playground adjoining a McDonald's eatery would qualify as a "public resource" under the regulation. The sheer diversity of these resources renders the regulation unreasonable.

Unlike the public resources listed in Section 3215(c) of Act 13, the regulations' proffered additions are not readily identifiable. The Department does not maintain a count or list of "schools" or "playgrounds" within the Commonwealth. The Pennsylvania Conservation Explorer's online planning tool does not include common areas of a school's property or playgrounds. *See* Commonwealth Court Preliminary Injunction Hearing, Stipulated Hearing Exhibit No. 2 at 86 ("the tool may not have data to identify all the public resources listed in Section 78a.15(f)(1), operators will need to conduct a field survey . . . to identify public resources. This field survey will likely include identification of schools and playgrounds 200 feet from the limit of disturbance of the well site."). The Agencies assert that the use of lists or databases provides reasonable and appropriate processes to identify public resources where the resource itself would not otherwise be visually identifiable. Respondents' Brief at 26. According to the Agencies, a permit applicant need only look 200 feet from its proposed limit of disturbance to see

52

whether a neighboring feature may fit the definition of a common area of a school or a playground that is open to the public. *Id.*

However, not all outdoor areas used for recreational purposes bear readily identifiable hallmarks such as jungle gyms, picnic tables, or swing sets. For example, it is not uncommon for school parking lots to serve as playgrounds at recess. *See Felger v. Duquesne Light Co.*, 273 A.2d 738, 739 (Pa. 1971) (school parking served as a playground). In addition, "open space lands used for outdoor recreation or the enjoyment of scenic or natural beauty and open to the public for such use" enrolled for preferential tax treatment under the Pennsylvania Farmland and Forest Land Assessment Act of 1974, commonly known as the Clean and Green Act (Clean and Green Act),[29] would certainly qualify as a "playground" under the Public Resource Regulations, but may not be visually identifiable as recreational space. *See* Section 2 of the Clean and Green Act, 72 P.S. §5490.2 (defining agricultural reserve and recreational activity[30]); *see also* Section 3 of the Clean and Green Act, 72 P.S. §5490.3 (permitting enrollment of ten contiguous acres of land devoted to "agricultural reserve").

Upon review, the regulatory definitions of the terms "common areas of a school's property" and "playground" are vague, overly broad, and unpredictable thereby making compliance unduly burdensome. "Common areas of a school's property" or "playgrounds" do not share the same attributes as the other public resources identified in the statute because they do not implicate public interest in the

---

[29] Act of December 19, 1974, P.L. 973, *as amended*, 72 P.S. §§5490.1-5490.13.

[30] Pursuant to Section 2 of the Clean and Green Act, "recreational activity" includes, but is not limited to, hunting; fishing; swimming; access for boating; animal riding; camping; picnicking; hiking; "agritainment" activities; operation of non-motorized vehicles; viewing or exploring a site for aesthetic or historical benefit or for entertainment; and operation of motorized vehicles incidental to these activities or necessary to remove a hunted animal. 72 P.S. §5490.2.

same way. In other words, a McDonald's playground or a school parking lot utilized as a playground are not of the same class or nature as a scenic river, public park, or historical site warranting Commonwealth trustee protection. Although common areas of a school's property and playgrounds may share some recreational similarities with the statutory public resources, they do not implicate "public interest" in the same way and they are not part of the trust corpus over which the Commonwealth is charged with protecting under the Constitution. For these reasons, we declare that the regulatory definition of public resources to the extent it includes "common areas of a school's property" and "playground" is void and unenforceable.

### E. "Public Resource Agencies"
#### 1. Contentions

Finally, the Coalition challenges the provisions of Section 78a.15(f)(2) and (g) related to "public resource agencies" and the definition of "public resource agency" in Section 78a.1 as unlawful and unenforceable. The Coalition maintains that, in *Robinson II*, the Supreme Court enjoined the Department's authority to consider comments of municipalities in the well permit process by declaring Section 3215(d) unconstitutional. Moreover, the Coalition claims that allowing municipalities to comment on well locations in the permit process circumvents due process rights of oil and gas owners. The Department cannot grant powers to municipalities that no statute provides. To do so would allow municipalities to condition permits beyond their authority under the Pennsylvania Municipalities Planning Code.[31]

---

[31] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§10101-11202.

In addition, the Coalition asserts that the addition of "playground owners" as "public resource agencies" is not only contrary to Pennsylvania law defining the term "agency," but is impractical and unworkable. An "agency" refers to a government agency, not private entities. The inclusion of playground owners as public resource agencies is patently unreasonable. Public resources are governed by singular public government agencies, such as the Pennsylvania Game Commission or the Pennsylvania Fish and Boat Commission, which can be easily identified and notified as appropriate during the well permit process. The inclusion of playground owners improperly adds thousands of unknown, unidentified, unlisted private entities as public resource agencies.

The Agencies respond that, although the Supreme Court in *Robinson II* declared Section 3215(d) unconstitutional, *see* 83 A.3d at 985, it did so because the statutory provision provided that the Department "may" consider comments and recommendations submitted by public resource agencies at its discretion. The Supreme Court found that this had the effect of marginalizing local input. Section 78a.15(g) of the Chapter 78a Regulations succeeds where Section 3215(d) of Act 13 failed by providing that the Department "will" consider such comments. Therefore, the Coalition's reliance on *Robinson II* is misplaced.

The Agencies further respond that the Public Resource Regulations do not violate due process. The Public Resource Regulations do not grant any powers to municipalities or allow them to exercise any authority in conditioning a permit. It merely authorizes the Department to consider their comments. The power to condition a permit lies solely with the Department. Its decisions are appealable to the Board.

As for the Coalition's challenge to the definition, the Agencies defend that "public resource agency" is a term of art used for purposes of the Chapter 78a Regulations that does not conflict with any definition elsewhere in Pennsylvania law. The Coalition incorrectly focuses on the usage of the word "agency" as defined by the body of administrative law. The term "agency" has a specialized purpose within this regulatory framework. The fact that playgrounds may not have one Commonwealth agency responsible for all of them does not render the regulation unreasonable or unworkable. Identifying and notifying the responsible public resource agency is something that can be readily determined on a case-by-case basis.

## 2. Analysis
### Statutory Authority

Section 78a.15(f) of the Chapter 78a Regulations provides that well applicants must notify public resource agencies responsible for managing the public resources of the application. From the date of notification, the public resource agency has 30 days to provide written comments to the Department regarding its recommendations to avoid, minimize, or otherwise mitigate probable harmful impacts to the public resource. Section 78a.15(g)(4) of the Chapter 78a Regulations provides that the Department "*will* consider . . . [t]he comments and recommendations submitted by public resource agencies . . . ." 25 Pa. Code §78a.15(g)(4) (emphasis added). The regulations define "public resource agency" as the entity responsible for managing a public resource, including "municipalities and playground owners." 25 Pa. Code §78a.1.

Turning to the statutory authority for these regulatory provisions, Section 3215(d) of Act 13 provides that "[t]he [D]epartment *may* consider the comments submitted under section 3212.1 (relating to comments by municipalities

56

and storage operators) in making a determination on a well permit." 58 Pa. C.S. §3215(d) (emphasis). Section 3215(d) further provides that, "[n]otwithstanding any other law, no municipality . . . shall have a right of appeal or other form of review from the [D]epartment's decision." *Id.*

In *Robinson II*, our Supreme Court[32] determined that Section 3215(d) was unconstitutional because it permitted the Department to consider, at its discretion, comments from municipalities, but it did not obligate the Department to do so. *Robinson II*, 83 A.2d at 984. The discretionary component rendered it non-responsive to local concerns. *See id.* The Supreme Court opined:

> Section 3215(d) marginalizes participation by residents, business owners, and their elected representatives with environmental and habitability concerns, whose interests Section 3215 ostensibly protects. *See* 58 Pa. C.S. §3202 (Declaration of purpose of chapter). The result is that Section 3215 fosters decisions regarding the environment and habitability that are non-responsive to local concerns; and, as with the uniformity requirement of Section 3304, the effect of failing to account for local conditions causes a disparate impact upon beneficiaries of the trust. Moreover, insofar as the Department . . . is not required, but is merely permitted, to account for local concerns in its permit decisions, Section 3215(d) fails to ensure that any disparate effects are attenuated. Again, inequitable treatment of trust beneficiaries is irreconcilable with the trustee duty of impartiality. *See* [*In re Hamill's Estate*, 410 A.2d 770, 773 (Pa. 1980)]; 20 Pa. C.S. §7773 [(relating to trusts)].

___

[32] Justice Baer concurred in the result reached by the lead justices that Section 3215(d) is unconstitutional, thereby inuring this portion of the plurality's opinion with precedential value. *Robinson II*, 83 A.3d at 1009 (Baer, J., concurring). *See Brown*, 23 A.3d at 556 ("[W]e must look to the substance of the concurrence to determine the extent to which it provides precedential value to points of agreement.").

*Robinson II*, 83 A.3d at 984. The Supreme Court concluded that Section 3215(d) of Act 13 "failed to properly discharge the Commonwealth's duties as trustee of the public natural resources." *Id.* On this basis, the Supreme Court enjoined application and enforcement of Section 3215(d). *Id.* at 1000.

Although Section 78a.15(g) appears to succeed where Section 3215(d) of Act 13 failed by providing that the Department "will" consider such comments and recommendations, because the Supreme Court enjoined application and enforcement of Section 3215(d), there is no statutory authority for the regulation. The Department cannot grant powers to municipalities that no statute provides. *See Pennsylvania Association of Life Underwriters*, 371 A.2d at 566 ("The power of . . . an agency to prescribe rules and regulations under a statute is only a power to adopt regulations to carry into effect the will of the Legislature as expressed by statute. Administrative agencies are not empowered to make rules and regulations which are violative of or exceed the powers given them by the statutes and the law, but must keep within the bounds of their statutory authority in the promulgation of general rules and orders."). Despite their best intentions, courts may not rewrite a statute or insert words to make it conform to constitutional requirements. *See Burke ex rel. Burke v. Independent Blue Cross*, 103 A.3d 1267, 1274 (Pa. 2014); *Coppolino v. Noonan*, 102 A.3d 1254, 1284 n.38 (Pa. Cmwlth. 2014), *aff'd*, 125 A.3d 1196 (Pa. 2015). Thus, we are constrained to conclude that Section 78a.15(g)'s requirement that the Department will consider comments and recommendations submitted by municipalities fails absent statutory authority. *See Pennsylvania Medical Society v. State Board of Medicine*, 546 A.2d 720, 723 (Pa. Cmwlth. 1988) (regulation that exceeded statutory authority declared void and unenforceable).

The Coalition argues that the inclusion of municipalities in the definition of "public resource agency" must likewise fail under *Robinson II*. In this regard, the Coalition mischaracterizes the holding in *Robinson II*. In *Robinson II*, the Supreme Court declared Section 3215(d) unconstitutional, not because it invited municipal comments, but because the Department was under no obligation to consider such comments. The Supreme Court opined that municipalities have obligations to protect the environment in their localities.[33]

As discussed above, the Commonwealth is the trustee of Pennsylvania's environmental public trust. *PEDF*, 161 A.3d at 931-32; *see Robinson II*, 83 A.3d at 955-567. The duties and powers attendant to the trust are not vested exclusively in any single branch of government. *See PEDF*, 161 A.3d at 919; *Robinson II*, 83 A.3d at 952, 956. "The plain intent" of Article I, Section 27 of the Pennsylvania Constitution "is to permit the checks and balances of government to operate in their usual fashion for the benefit of all the people in order to accomplish the purposes of the trust. This includes local government." *Robinson II*, 83 A.3d at 956-57. "Protection of environmental values, in this respect, is a quintessential local issue that must be tailored to local conditions." *Robinson II*, 83 A.3d at 979. Local government is a Section 27 trustee. *See id.* Based on our reading of *PEDF* and *Robinson II*, we conclude that the inclusion of municipalities in the definition of a "public resource agency" is within the power bestowed under Act 13. *See Tire Jockey*, 915 A.2d at 1186.

---

[33] Although Justice Baer concurred to express his belief that portions of Act 13 violated due process by usurping local municipalities' duties to impose and enforce community planning, he agreed that local participation is necessary. *Robinson II*, 83 A.3d at 1001 (Baer, J., concurring). "[I]n a state as large and diverse as Pennsylvania, meaningful protection of the acknowledged substantive due process right of an adjoining landowner to quiet enjoyment of his real property can only be carried out *at the local level*." *Id.* (emphasis added).

Moreover, the municipality in which the well is located may be readily determined. Municipalities have identifiable points of contact for notification purposes. Thus, the inclusion of municipalities in the definition is not unreasonable.

However, such is not the case with "playground owners." Playground owners are not government agencies. Ordinarily, the term "agency" commonly refers to a government agency. *See* Section 101 of the Administrative Agency Law, 2 Pa. C.S. §101 (the term "agency" refers to "[a] government agency," meaning "any Commonwealth agency or any political subdivision or municipal or other local authority, or any officer or agency of any such political subdivision or local authority."). Unlike the governmental agencies, playground owners are not "trustees" with any duties or obligations to protect the environmental trust under Article I, Section 27 of the Pennsylvania Constitution or Act 13. The Agencies have no authority to elevate private entities as public agencies responsible for ensuring the public trust.

Moreover, playground owners are not readily identifiable. For starters, the regulatory definition bears an internal ambiguity. The actual "owner" of the playground may not necessarily be the "entity responsible for managing" the playground. *See* 25 Pa. Code §78a.1. For instance, a playground may be owned by one entity and managed by another. Under the definition, it is unclear which would be the "public resource agency" for notification purposes.

Under either interpretation, identifying and notifying the appropriate contact may be impossible, if not extremely burdensome. Unlike the other public resources listed in Section 3215(c), "playgrounds" are not governed by singular government agencies that can be easily identified and notified during the well permitting process. A "playground owner" may be a corporation, homeowners'

association, estate, trust, or private citizen. Even if the playground owner is identified, the point of contact for such private "owners" may be unknown, unidentified, or unlisted. Requiring a permit applicant to identify and notify "playground owners" is unduly burdensome and unreasonable. And, considering our problem with the regulatory definition of "common areas of a school's property" and "playgrounds," as discussed above, the definition of "public resource agency" to the extent it includes owners of such recreational areas fails by extension. For these reasons, we conclude that the addition of "playground owners" as a public resource agency is unlawful and unenforceable.[34]

## V. Conclusion

In sum, we grant the Coalition's Application in part and we deny it in part. We grant the Application to the extent that we declare the regulatory definitions of "other critical communities," "common areas of a school's property," and "playground" contained in 25 Pa. Code §78a.1 as void and unenforceable. We declare the regulatory definition of "public resource agency," contained in 25 Pa. Code §78a.1 and as used within 25 Pa. Code §78a.15(f), (g), void and unenforceable to the extent that it includes "playground owners." We are also constrained to declare Section 78a.15(g)'s requirement that the Department will consider comments and recommendations submitted by municipalities is unconstitutional and unenforceable based on the Supreme Court's decision in *Robinson II*, in which it declared Section 3215(d) of Act 13, 58 Pa. C.S. §3215(d) – the statutory

---

[34] In light of our disposition of this issue, we will not address the Coalition's due process claims.

authorization for this regulatory provision – unconstitutional and enjoined its application and enforcement. We deny the Application in all other respects.


_____

MICHAEL H. WOJCIK, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The Marcellus Shale Coalition,     :
                                 :
                 Petitioner     :
                                 :
                v.            : No. 573 M.D. 2016
                                 :
Department of Environmental     :
Protection of the Commonwealth of     :
Pennsylvania and Environmental     :
Quality Board of the Commonwealth     :
of Pennsylvania,     :
                                 :
              Respondents    :

**O R D E R**

AND NOW, this 23rd day of August, 2018, Petitioner's Application for Partial Summary Relief (Application) seeking summary relief on Count I of its Petition for Review in the Nature of a Complaint Seeking Declaratory and Injunctive Relief is GRANTED IN PART and DENIED IN PART. The Application is GRANTED to the extent that:

1) The definitions of "other critical communities," "common areas of a school's property," and "playground" contained in Section 78a.1 of Title 25, Chapter 78a of the Pennsylvania Administrative Code (Chapter 78a Regulations), 25 Pa. Code §78a.1, are hereby declared void and unenforceable;

2) The definition of "public resource agency" in Section 78a.1 of the Chapter 78a Regulations, 25 Pa. Code §78a.1, to the extent that it includes "playground owners," is hereby declared void and unenforceable; and

3) Section 78a.15(g)'s requirement that the Department will consider comments and recommendations submitted by municipalities is declared unconstitutional and unenforceable based on the Supreme Court's decision in *Robinson Township v. Commonwealth*, 83 A.3d 901, 984, 1000 (Pa. 2013) (*Robinson II*), in which it declared Section 3215(d) of Act 13 of 2012, 58 Pa. C.S. §3215(d) – the statutory authorization for this regulatory provision – unconstitutional and enjoined its application and enforcement.

The Application is DENIED in all other respects.

_____
MICHAEL H. WOJCIK, Judge

2