IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David N. Hommrich,            :
                             :
              Petitioner      :
                             :
         v.                   : No. 463 M.D. 2022
                             : Argued: April 9, 2025
Commonwealth of Pennsylvania, :
Pennsylvania Public Utility   :
Commission,                   :
                             :
              Respondent      :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE LORI A. DUMAS, Judge
           HONORABLE STACY WALLACE, Judge
           HONORABLE MATTHEW S. WOLF, Judge

OPINION BY JUDGE WOJCIK                    FILED: August 13, 2025


         Before this Court is an Application for Partial Summary Relief (ASR) filed by Petitioner David N. Hommrich (Hommrich) and Intervenors Kriebel Minerals, Inc. (Kreibel) and ERD Energy, LLC (ERD) (collectively, Petitioners) seeking declarations that certain regulations promulgated by the Pennsylvania Public Utility Commission (PUC) on alternative energy (Regulations)[1] are inconsistent with the Alternative Energy Portfolio Standards Act (AEPS Act)[2] and, therefore, are invalid and unenforceable. After careful review, we deny the ASR.

---

[1] The Regulations are codified in Title 52, Chapter 75 of the Pennsylvania Code, 52 Pa. Code §§75.1-75.72.

[2] Act of November 30, 2004, P.L. 1672, *as amended*, 73 P.S. §§1648.1-1648.8.

# I. Background

Hommrich, who is the sole owner of a solar power project located in Mercer County, Pennsylvania, and frequent petitioner in alternative energy litigation, initiated this action by filing, *pro se*, a petition for review (PFR) in the nature of a complaint for declaratory relief in this Court's original jurisdiction, which he later amended (Amended PFR).[3] Kreibel, a natural gas company operating in the Commonwealth of Pennsylvania, and ERD, its equipment supplier (together, Intervenors), which are owned and operated by the same individuals, were permitted to intervene. Intervenors have adopted Hommrich's Amended PFR in its entirety with an additional prayer for relief. *See* Intervenors' Application for Intervention, Request for Relief ¶78.

The gravamen of the Amended PFR challenges Regulations pertaining to the interconnection of "alternative energy systems"[4] and requires statutory interpretation of the AEPS Act. Interconnection is the mechanism through which a source of generation connects and delivers power to an electrical distribution system. *See* Amended PFR, ¶7; Answer to Amended PFR, ¶7. Petitioners are approved "customer-generators" as defined under Section 2 of the AEPS Act[5] that own and/or

---

[3] In response to the PFR, the PUC filed preliminary objections (POs), which were mooted by the amendment. PUC filed new POs to the Amended PFR, which this Court overruled by order and opinion dated March 1, 2024. We directed the PUC to file an answer to the Amended PFR.

[4] An "alternative energy system" is defined as "[a] facility or energy system that uses a form of alternative energy source to generate electricity and delivers the electricity it generates to the distribution system of an electric distribution company or to the transmission system operated by a regional transmission organization." Section 2 of the AEPS Act, 73 P.S. §1648.2.

[5] A "customer-generator" is defined as:

> A nonutility owner or operator of a net metered distributed generation system with a nameplate capacity of not greater than 50

**(Footnote continued on next page…)**

2

operate net metered[6] distributed generation systems, which generate electricity from alternative energy sources.[7]  Customer-generators are customers of electric distribution companies (EDCs) and generate electricity that flows into the EDCs'

kilowatts if installed at a residential service or not larger than 3,000 kilowatts at other customer service locations, except for customers whose systems are above three megawatts and up to five megawatts who make their systems available to operate in parallel with the electric utility during grid emergencies as defined by the regional transmission organization or where a microgrid is in place for the primary or secondary purpose of maintaining critical infrastructure, such as homeland security assignments, emergency services facilities, hospitals, traffic signals, wastewater treatment plants or telecommunications facilities, provided that technical rules for operating generators interconnected with facilities of an electric distribution company, electric cooperative or municipal electric system have been promulgated by the Institute of Electrical and Electronic Engineers and the [PUC].

73 P.S. §1648.2.

[6] "Net metering" refers to:

The means of measuring the difference between the electricity supplied by an electric utility and the electricity generated by a customer-generator when any portion of the electricity generated by the alternative energy generating system is used to offset part or all of the customer-generator's requirements for electricity. Virtual meter aggregation on properties owned or leased and operated by a customer-generator and located within two miles of the boundaries of the customer-generator's property and within a single electric distribution company's service territory shall be eligible for net metering.

Section 2 of the AEPS Act, 73 P.S. §1648.2.

[7] The term "alternative energy sources" includes energy sourced from solar; wind; hydropower; geothermal; biomass; biologically derived methane gas; fuel cells; waste coal; coal mine methane; energy efficiency; and distributed generation systems.  Section 2 of the AEPS Act, 73 P.S. §1648.2.

3

distribution systems. The AEPS Act provides for the retail compensation for any excess electricity generated by any AEPS-qualified generating system owned or operated by a customer-generator. To deliver the energy into the EDCs' distribution systems, customer-generators must first interconnect with the EDCs' distribution systems. Absent an interconnection, customer-generators' alternative energy systems cannot deliver and sell excess energy to an EDC.

According to Petitioners, the Regulations have allowed EDCs to cause customer-generators, like Petitioners, to bear all costs involved in the planning, design, development, and implementation of distribution system improvements, including interconnection, that enable EDCs to purchase excess energy generated from alternative energy sources. Petitioners assert that the AEPS Act does not obligate customer-generators to pay for these costs, but rather it requires them to be paid by ratepayers as a cost of generation supply. Petitioners claim that their business interests are adversely impacted by the Regulations. Petitioners maintain that the challenged Regulations are invalid because they are contrary to the AEPS Act and precedent limiting the PUC's authority in these matters. Petitioners seek declarations interpreting the AEPS Act and invalidating and/or limiting the Regulations. *See* Amended PFR, Requests for Relief A-I; Intervenors' Application for Intervention, Request for Relief ¶78(a).

PUC filed an answer to the Amended PFR denying material allegations. On July 19, 2024, Petitioners filed the ASR and accompanying Memorandum of Law. The PUC filed an answer and brief in response.

Petitioners seek partial summary relief narrowed to the following six requests:[8]

- Declare that excess energy purchased from customer-generators by EDCs pursuant to Section 5 of the AEPS Act, 73 P.S. §1648.5, constitutes the purchase of a "resource" as that term is described in Section 3(a)(3)(ii) of the AEPS Act, 73 P.S. § 1648.3(a)(3)(ii). *See* Amended PFR, Request for Relief A.

- Declare that the costs to interconnect to EDCs' distribution systems, which enables EDCs to purchase electricity generated from alternative energy sources, are "direct or indirect resource costs" subject to the mandatory cost recovery mechanism in Section 3(a)(3)(ii) of the AEPS Act, 73 P.S. §1648.3(a)(3)(ii). As such, those costs must be recovered from ratepayers on a full and current basis pursuant to an automatic energy adjustment clause under Section 1307 of the Public Utility Code, 66 Pa. C.S. §1307, as a cost of generation supply under Section 2807 of the Public Utility Code, 66 Pa. C.S. §2807. *See* Amended PFR, Request for Relief B.

- Declare that the AEPS Act does not give the PUC a legislative grant of authority to promulgate regulations for cost recovery pursuant to Section 3(a)(3)(ii) of the AEPS Act, 73 P.S. §1648.3(a)(3)(ii), and that Section 75.67 of the Regulations, 52 Pa. Code §75.67, governing "alternative energy cost-recovery," impermissibly alters the clear language of the AEPS Act and is, therefore, invalid and unenforceable. *See* Amended PFR, Request for Relief C.

---

[8] Petitioners have abandoned Requests for Relief E through G in their Amended PFR. *See* Petitioners' ASR, at 2 n.1. They have tabled Request for Relief H, seeking a declaration that

> [c]ustomer-generators may utilize third-party contractors, under confidentiality commitments with an EDC, to provide both impact studies and design and construction services in order to facilitate a timely and cost-effective interconnection, so long as the cost or timeline of the third-party option results in a lower cost or a shorter timeline for the customer-generator[,]

because additional factual development is necessary and summary relief is not appropriate at this time. *Id*.

5

- Extend these holdings by declaring that any other PUC Regulations allowing EDCs to charge customer-generators for distribution system improvement costs associated with the interconnection of a renewable energy systems are invalid and unenforceable as contrary to the AEPS Act. *See* Amended PFR, Request for Relief D.

- Declare as invalid the current PUC practice of allowing EDCs to impose costs on customer-generators in the form of a Contribution in Aid of Construction (CIAC), a Public Utility Code concept wholly absent from the AEPS Act, and another example of the PUC improperly allowing the imposition of costs on customer-generators. *See* Amended PFR, Request for Relief I.

- Declare that Sections 75.13(d) and (e) of the Regulations, 52 Pa. Code §75.13(d) and (e), are unauthorized by and contrary to the AEPS Act, and therefore invalid and unenforceable. *See* Intervenors' Application for Intervention, Request for Relief ¶78(a).

ASR at 1-2.

## II. Discussion
### A. Applicable Legal Standards

In ruling on ASRs, this Court has explained:

An [ASR] may be granted if a party's right to judgment is clear, and no material issues of fact are in dispute. When ruling on an [ASR], we must view the evidence of record in the light most favorable to the non-moving party and enter judgment only if there is no genuine issue as to any material facts and the right to judgment is clear as a matter of law.

*Gregory v. Pennsylvania State Police*, 185 A.3d 1202, 1205 (Pa. Cmwlth. 2018) (citations and quotations omitted).

When a regulation is challenged, we consider:

It is axiomatic that all regulations "must be consistent with the statute under which they were promulgated." *Slippery Rock Area School District v. Unemployment Compensation Board of Review*, 983 A.2d 1231, 1241 ([Pa.] 2009). "A statute is the law and trumps an

6

administrative agency's regulations." [*Commonwealth v.*] *Kerstetter*, 62 A.3d [1065,] 1069 [(Pa. Cmwlth. 2013), *aff'd*, 94 A.3d 991 (Pa. 2014)]. Similarly, "[w]here there is a conflict between the statute and a regulation purporting to implement the provisions of that statute, the regulation must give way." *Commonwealth v. Colonial Nissan, Inc.*, 691 A.2d 1005, 1009 (Pa. Cmwlth. 1997).

"[W]hen an agency adopts a regulation pursuant to its legislative rule-making power, as opposed to its interpretive rule-making power, it is valid and binding upon courts as a statute so long as it is (a) adopted within the agency's granted power, (b) issued pursuant to proper procedure, and (c) reasonable." *Tire Jockey Service, Inc. v. Department of Environmental Protection*, 915 A.2d 1165, 1186 ([Pa.] 2007). When analyzing whether a regulation is adopted within an agency's granted power, a court should consider, *inter alia*, whether the regulation is "consistent with the enabling statute" because "clearly, the [General Assembly] would not authorize agencies to adopt regulations inconsistent with the enabling statutes." *Marcellus Shale Coalition v. Department of Environmental Protection*, 216 A.3d 448, 459 . . . (Pa. Cmwlth. 2019) (internal quotation marks omitted). Thus, when "a regulation presents 'an actual conflict with the statute,' we cannot reasonably understand the regulation to be within the agency's ambit of authority, and the statute must prevail." *Id*. (quoting *AMP Inc. v. Commonwealth*, 814 A.2d 782, 786 (Pa. Cmwlth. 2002), *aff'd*, 852 A.2d 1161 ([Pa.] 2004)).

*Victory Bank v. Commonwealth*, 219 A.3d 1236, 1242 (Pa. Cmwlth. 2019), *aff'd*, 240 A.3d 95 (Pa. 2020) (emphasis added; footnote omitted).

Similar to claims made in *Hommrich v. Pennsylvania Public Utility Commission*, 231 A.3d 1027, 1033 (Pa. Cmwlth. 2020) (*Hommrich I*), Petitioners' arguments here largely "center[] over whether the PUC has the authority to enact the challenged [R]egulations and whether those [R]egulations contradict the AEPS Act." This calls for a straightforward analysis, as "[s]uch issues may be resolved

based on comparison of statutory interpretation and regulatory provisions as a matter of law." *Id*. (citing *Marcellus Shale Coalition v. Department of Environmental Protection*, 193 A.3d 447, 460 (Pa. Cmwlth. 2018), *appeal quashed*, 198 A.3d 330 (Pa. 2018)).

"'To determine whether a regulation is adopted within an agency's granted power, we look for statutory language authorizing the agency to promulgate the legislative rule and examine that language to determine whether the rule falls within the grant of authority.'" *Hommrich I*, 231 A.3d at 1034 (quoting *Marcellus Shale Coalition v. Department of Environmental Protection*, 216 A.3d 448, 459 (Pa. Cmwlth.), *appeals quashed*, 223 A.3d 655 (Pa. 2019)). "We consider 'the purpose of the statute and its reasonable effect' and whether 'the regulation is consistent with the enabling statute.'" *Id*. (quoting *Marcellus Shale*, 216 A.3d at 459). The General Assembly would not authorize an agency "to adopt binding regulations inconsistent with the applicable enabling statutes." *Id.* (citation and quotation omitted). "When . . . a regulation presents an actual conflict with the statute, we cannot reasonably understand the regulation to be within the agency's ambit of authority, and the statute must prevail." *Id.* (citation and quotation omitted). Administrative agencies do not have the power to make laws, only to prescribe rules and regulations to carry out the law. *Id*. at 1035.

In some instances, the General Assembly confers broad regulatory power upon an agency. *Hommrich I*, 231 A.3d at 1035. "If the statute makes a clear grant of authority, then neither a court nor the agency can disregard the clearly expressed intent of the General Assembly." *Marcellus Shale Coalition v. Department of Environmental Protection*, 292 A.3d 921, 936 (Pa. 2023). Although the General Assembly has conferred broad powers to agencies in other chapters

relating to alternative energy, as this Court has previously recognized, the powers "conferred to the PUC under the AEPS Act are much narrower." *Hommrich I*, 231 A.3d at 1035.

The statutory language of the AEPS Act is the starting point. When examining statutory language, we follow the rules of statutory construction in the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa. C.S. §1501-1991. As our Supreme Court has recently explained:

> [Section 1921(a) of] [t]he Statutory Construction Act provides that the object of all statutory interpretation "is to ascertain and effectuate the intention of the General Assembly." 1 Pa. C.S. §1921(a). Generally, the plain language of the statute provides the best indication of legislative intent." *Miller v.* [*County*] *of Centre*, []173 A.3d 1162, 1168 ([Pa.] 2017). If the statutory language is clear and unambiguous in setting forth the intent of the General Assembly, then "we cannot disregard the letter of the statute under the pretext of pursuing its spirit." *Fletcher v.* [*Pennsylvania Property & Casualty Insurance Guarantee Association*], []985 A.2d 678, 684 ([Pa.] 2009) (citing 1 Pa. C.S. §1921(b)). In this vein, "we should not insert words into [a statute] that are plainly not there." *Frazier v. Workers'* [*Compensation*] *Appeal* [*Board*] *(Bayada Nurses, Inc.)*, 616 Pa. 592, 52 A.3d 241, 245 (2012). When the statutory language is ambiguous, however, we may ascertain the General Assembly's intent by considering the factors set forth in Section 1921(c) of the Statutory Construction Act, 1 Pa. C.S. §1921(c), and other rules of statutory construction. *See* [*Pennsylvania School Boards Association*]*, Inc. v.* [*Public School Employees Retirement Board*], []863 A.2d 432, 436 ([Pa.] 2004) (observing that "other interpretative rules of statutory construction are to be utilized only where the statute at issue is ambiguous"). "We also presume that 'the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable,' and that 'the General Assembly intends the entire statute to be effective and certain.'" *Berner v. Montour* [*Township*] *Zoning*

9

> *Hearing* [*Board*], []217 A.3d 238, 245 ([Pa.] 2019) (quoting 1 Pa. C.S. §1922(1)-(2)).
>
> Section 1921(b) of the Statutory Construction Act, which provides that "when the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit," is crucial to our analysis here. If the statute or rule . . . are not ambiguous, then we cannot apply the presumptions set forth in Section 1922 of the Statutory Construction Act. "A statute is ambiguous when there are at least two reasonable interpretations of the text under review." *Warrantech Consumer* [*Products Services*]*, Inc. v. Reliance* [*Insurance*] *Co. in Liquidation*, []96 A.3d 346, 354-55 ([Pa.] 2014). "This Court has consistently held that . . . interpretive rules of statutory construction are to be utilized only where the statute [or rule] at issue is ambiguous." [*Pennsylvania School Board Association*], 863 A.2d at 436.

*Commonwealth v. Green*, 291 A.3d 317, 327-28 (Pa. 2023).

Legislative rules that are properly enacted are presumed to be reasonable, and reviewing courts will accord them a "particularly high measure of deference." *Marcellus Shale*, 292 A.3d at 927 (citation omitted). While this Court may not substitute its own judgment for that of an agency, we will defer to a regulation an agency has promulgated pursuant to its interpretative powers where the regulation is reasonable and "genuinely tracks the meaning of the underlying statute." *Id*. at 929 (citation omitted); *accord Tire Jockey*, 915 A.2d at 1190. Indeed, when "faced with interpreting statutory language," we "afford great deference to the interpretation rendered by the administrative agency overseeing the implementation of such legislation." *Winslow–Quattlebaum v. Maryland Ins. Group*, 752 A.2d 878, 881 (Pa. 2000). However, "no deference is due where an agency exceeds its legal authority, or its interpretation is clearly erroneous." *Marcellus Shale*, 292 A.3d at 929 (citations omitted). "While an agency's interpretation of an ambiguous statute

it is charged with enforcing is entitled to deference, courts' deference never comes into play when the statute is clear." *Seeton v. Pennsylvania Game Commission*, 937 A.2d 1028, 1037 (Pa. 2007). With these legal standards in mind, we address each of Petitioners' requests for relief.

## B. Requests for Relief
### *Amended PFR, Requests for Relief A, B, and C*

Petitioners' first three requests focus on Section 3(a)(3)(ii) of the AEPS Act, 73 P.S. §1648.3(a)(3)(ii), which dictates who pays, and how, for the costs associated with the purchase of electricity generated from alternative energy sources. Because these requests for relief are interrelated and interdependent, we address them together.

Petitioners maintain that excess energy purchased from customer-generators by EDCs pursuant to Section 5 of the AEPS Act, 73 P.S. §1648.5, are "resource" purchases as described in Section 3(a)(3)(ii) of the AEPS Act, 73 P.S. §1648.3(a)(3)(ii), which include "the purchase of electricity generated from alternative energy sources." As resources, Petitioners advance that "any direct or indirect costs" must be recovered as a cost of generation supply under Section 3(a)(3)(ii) of the AEPS Act. Costs incurred by EDCs – whether direct or indirect – can only be recovered from ratepayers through the automatic energy adjustment clause in Section 3(a)(3)(ii). Although the PUC may not agree with the General Assembly's decision to compensate customer-generators for excess energy at full retail value and costs under the AEPS Act, that is how it operates and was intended to operate. The PUC's role is to implement the business model chosen by the General Assembly to encourage growth and investment in renewable sources of energy. Therefore, Petitioners ask this Court to declare that excess energy purchases

11

under Section 5 of the AEPS Act qualify as resource purchases under Section 3 of the AEPS Act and, as such, constitute direct and indirect costs that must be recovered on a full and current basis through an automatic energy adjustment clause under Section 1307 of the Code, 66 Pa. C.S. §1307, as a cost of generation supply under Section 2807 of the Code, 66 Pa. C.S. §2807.

If the Court agrees with the foregoing statutory analysis, Petitioners ask this Court to also declare the Regulation at 52 Pa. Code §75.67, governing "alternative energy cost-recovery," invalid and unenforceable for two reasons. First, this Regulation conflicts with Section 3 of the AEPS Act because it alters the statutory language to make automatic adjustment clause recovery optional rather than mandatory through the use of "may" instead of "shall." This improperly allows the imposition of interconnection costs on customer-generators rather than ratepayers. Second, the AEPS Act does not grant the PUC a legislative grant of authority to promulgate regulations for cost recovery pursuant to Section 3 of the AEPS Act.

To begin, under Section 5 of the AEPS Act, EDCs are mandated to purchase all excess energy from net-metered customer-generators. Specifically:

> *Excess generation from net-metered customer-generators shall receive full retail value for all energy produced on an annual basis. The* [PUC] *shall develop technical and net metering interconnection rules for customer-generators* intending to operate renewable onsite generators in parallel with the electric utility grid, consistent with rules defined in other states within the service region of the regional transmission organization that manages the transmission system in any part of this Commonwealth. The [PUC] shall convene a stakeholder process to develop Statewide technical and net metering rules for customer-generators. The [PUC] shall develop

12

these rules within nine months of the effective date of this act.

73 P.S. §1648.5 (emphasis added). Excess generation, also known as surplus power, occurs when a customer-generator produces more electricity than needed for all excess energy produced. *Id*.; *Hommrich I*, 231 A.3d at 1034.

Section 3 of the AEPS Act, 73 P.S. §1648.3, governs the cost recovery for the purchase of electric distribution by EDCs to comply with the AEPS Act. Specifically, Section 3(a)(3) of the AEPS Act states:

(3) All costs for:

(i) the purchase of electricity generated from alternative energy sources, including the costs of the regional transmission organization, in excess of the regional transmission organization real-time locational marginal pricing, or its successor, at the delivery point of the alternative energy source for the electrical production of the alternative energy sources; and

(ii) payments for alternative energy credits [(AECs)],

in both cases that are voluntarily acquired by an [EDC] during the cost recovery period on behalf of its customers shall be deferred as a regulatory asset by the [EDC] and fully recovered, with a return on the unamortized balance, pursuant to an automatic energy adjustment clause under [Section 1307 of the Public Utility Code,] 66 Pa. C.S. §1307 (relating to sliding scale of rates; adjustments) as a cost of generation supply under [Section 2807 of the Public Utility Code,] 66 Pa. C.S. §2807 (relating to duties of [EDCs]) in the first year after the expiration of its cost-recovery period. After the cost-recovery period, ***any direct or indirect costs*** *for the purchase by electric distribution of **resources to comply with this section***, including, but not limited to, *the purchase of electricity generated from alternative energy sources*, payments for [AECs], cost of credits banked, payments to any third party administrators for performance under this act and costs levied by a

13

> regional transmission organization to ensure that alternative energy sources are reliable, ***shall be recovered on a full and current basis pursuant to an automatic energy adjustment clause*** *under 66 Pa. C.S. §1307 as a cost of generation supply under 66 Pa. C.S. §2807.*

73 P.S. §1648.3(a)(3) (emphasis added).

Section 3 of the AEPS Act expressly incorporates by reference Sections 1307 and 2807 of the Public Utility Code, 66 Pa. C.S. §§1307 and 2807. In turn, Section 2807(e)(3.5) of the Public Utility Code cross references Section 3 of the AEPS Act:

> [T]he provisions of this section shall apply to any type of energy purchased by a default service provider to provide electric generation supply service, including energy or alternative energy portfolio standards credits *required to be purchased under* [*Section 3 of the AEPS Act*] . . . .

66 Pa. C.S. §2807(e)(3.5) (emphasis added). Because Section 3 of the AEPS Act and 66 Pa. C.S. §§1307 and 2807 "relate to the same persons or things," *i.e.*, EDC recovery of the costs of purchasing AECs, these provisions are *in pari materia* and must be construed together, if possible, as one statute. Section 1932 of the Statutory Construction Act, 1 Pa. C.S. §1932.

Complementing the PUC's power to create an AEC program to implement Section 3 as required by the AEPS Act, Section 1307 of the Code grants the PUC authority, "*by regulation or order,*" to "prescribe for any class of public utilities . . . a mandatory system for the automatic adjustment of their rates[.]" 66 Pa. C.S. §1307(b) (emphasis added). Meanwhile, Section 2807 of the Code provides for customer choice in the electric power supply market and requires EDCs, as "the default service provider," to "provide electric generation supply service to [a] customer pursuant to a [PUC]-approved competitive procurement plan." 66 Pa. C.S. §2807(e)(3.1). Section 2807 of the Code authorizes the PUC to

14

supervise, evaluate, and approve EDC cost recovery of energy supply, including AECs required by the AEPS Act:

> • "The default service provider shall file a plan for competitive procurement with the [PUC] and obtain [PUC] approval of the plan . . . ." 66 Pa. C.S. §2807(e)(3.6).

> • "At the time the [PUC] evaluates the plan and prior to approval, in determining if the default electric service provider's plan obtains generation supply at the least cost, the [PUC] shall consider the default service provider's obligation to provide adequate and reliable service to customers and that the default service provider has obtained a prudent mix of contracts . . . ." 66 Pa. C.S. §2807(e)(3.7).

> • "[T]he [PUC] may modify contracts or disallow costs only when the party seeking recovery of the costs" is found to be at fault for failure to comply with the plan or fraud, collusion or market manipulation. 66 Pa. C.S. §2807(e)(3.8).

> • "The default service provider shall have the right to recover on a full and current basis, pursuant to a reconcilable automatic adjustment clause under section 1307 (relating to sliding scale of rates; adjustments), all reasonable costs incurred under this section and a [PUC]-approved competitive procurement plan." 66 Pa. C.S. §2807(e)(3.9).

Drawing upon these statutory grants of authority and responsibility, the PUC conducted rulemaking to implement Section 3 of the AEPS Act and provide for EDC cost recovery related solely to the ensuring that a certain portion of the electricity that is sold to customers is generated from alternative energy sources. The PUC adopted the challenged Regulation, 52 Pa. Code §75.67, after notice and comment and reasoned deliberation. Section 75.67 of the Regulations governs alternative energy cost recovery and provides:

15

(a) A default service provider *may* recover from default service customers the following reasonable and prudently incurred costs for compliance with the [AEPS A]ct:

(1) The costs of electricity generated by an alternative energy system, purchased by a default service provider, and delivered to default service customers for purposes of compliance with §75.61 (relating to EDC and EGS obligations).

(2) The costs of [AECs] purchased and used within the same reporting period for purposes of compliance with §75.61.

(3) The costs of [AECs] purchased in one reporting period and banked for use in later reporting periods, consistent with §75.69 (relating to banking of [AECs]).

(4) The costs of [AECs] purchased in the true-up period to satisfy compliance obligations for the most recently concluded reporting period, consistent with §75.61(e).

(5) Payments to the [AECs] program administrator for its costs of administering an [AECs] program, consistent with §75.64 (relating to alternative energy credit program administrator).

(6) Payments to a third party for its costs in operating an [AECs] registry, consistent with §75.70 (relating to the alternative energy credit registry).

(7) The costs levied by a regional transmission organization to ensure that alternative energy sources are reliable.

(8) The costs of alternative compliance payments made under §75.66 (relating to force majeure).

\* \* \* \*

16

(d) The costs of compliance with the [AEPS Act] *shall be recovered through an automatic adjustment* clause within the meaning of 66 Pa. C.S. §1307 (relating to sliding scale of rates; adjustments) and consistent with §54.187 (relating to default service rate design and the recovery of reasonable costs) according to the following standards:

(1) Costs incurred by a default service provider during the cost-recovery period shall be deferred as a regulatory asset and fully recovered with a return on the unamortized balance during the first full 12-month reporting period after the expiration of the cost-recovery period in the EDC service territory where it is acting as the default service provider.

(2) Costs incurred by a default service provider after the expiration of a cost-recovery period shall be recovered during the reporting period in which they are incurred, except as provided for in paragraph (7).

(3) The default service implementation plan shall include a schedule of rates for the recovery of these costs as required under 66 Pa. C.S. §1307(a).

(4) A default service provider shall file a report with the [PUC] within 30 days of the conclusion of each reporting period that includes the information identified in 66 Pa. C.S. §1307(e)(1).

(5) The [PUC] will hold public hearings on the substance of these reports, and other matters pertaining to this subject, as required by 66 Pa. C.S. §1307(e)(2).

(6) The [PUC] will order the default service provider to provide refunds to or recover additional costs from default service customers consistent with 66 Pa. C.S. §1307(e)(3).

(7) The costs of [AECs] purchased by the default service provider during the true-up period under section 3(e)(5) of the act (73 P.S. §1648.3(e)(5)) shall be

17

> recovered during the reporting period in which these costs
> are incurred.

52 Pa. Code §75.67(a), (d) (emphasis added).

Upon review, Section 3 of the AEPS Act provides that "any direct or indirect costs for the *purchase* by electric distribution *of resources to comply with this section* . . . shall be recovered on a full and current basis pursuant to an automatic energy adjustment clause under 66 Pa. C.S. §1307 as a cost of generation supply under 66 Pa. C.S. §2807." 73 P.S. §1648.3(a)(3)(ii) (emphasis added). By its plain language, Section 3 is limited to costs for the "purchase" by EDCs of resources "*to comply with this section*," meaning Section 3. *Id*. (emphasis added). Section 3 of the AEPS Act deals with an EDC's duty to purchase certain percentages of their total energy supply from alternative sources and to demonstrate compliance by accumulating AECs. Section 3 makes clear that qualified alternative energy is a component of a mix of energy supply contracts EDCs purchase to meet their default service obligations. Contrary to Petitioners' assertions, Section 3's reference to "resources" refers to alternative energy resources purchased to satisfy Section 3's requirements, not an EDC's obligation to pay for excess generation at the full retail value under Section 5 of the AEPS Act.

Further, Section 3 incorporates both Sections 1307 and 2807 of the Public Utility Code, providing the regulatory pathway for EDCs to recover their Section 3 costs. Section 2807 of the Public Utility Code applies, by its own terms, "to any type of energy purchased by a default service provider to provide electric generation supply service, including energy . . . *required to be purchased* under . . . the [AEPS] Act." 66 Pa. C.S. §2807(e)(3.5) (emphasis added). Consequently, costs associated with interconnection are not "direct or indirect costs" of compliance with Section 3 of the AEPS Act.

18

Section 75.67(d) of the Regulations closely tracks the statutory language providing that the "[t]he costs of compliance with the [AEPS A]ct shall be recovered through an automatic adjustment clause within the meaning of 66 Pa. C.S. §1307 (relating to sliding scale of rates; adjustments) and consistent with §54.187 (relating to default service rate design and the recovery of reasonable costs)." 52 Pa. Code §75.67(d). The Regulation permits EDCs to recover costs of compliance with Section 3 of the AEPS Act via the statutory and regulatory mechanisms established pursuant to Section 1307 and 2807 of the Public Utility Code.

Petitioners take issue with Section 75.67 of the Regulations, particularly subsection (a), which provides that a "default service provider *may* recover from default service customers the following reasonable and prudently incurred costs for compliance with the [AEPS A]ct . . . ." 52 Pa. Code §75.67(a) (emphasis added). Petitioners claim that the PUC impermissibly altered the clear language of the statute by swapping out the "shall" with "may." As the PUC explains, Section 3 of the AEPS Act merely provides that costs "shall be recovered" pursuant to Sections 1307 and 2807 of the Code. However, it does not provide that EDCs shall recover every cost they claim. This interpretation is supported by Sections 1307 and 2807 of the Public Utility Code because those sections require an EDC to present costs to the PUC for approval as part of a competitive procurement process. *See* 66 Pa. C.S. §§1307, 2807. Therefore, not all costs are approved. Any costs that are approved by the PUC are recovered from ratepayers on a full and current basis pursuant to an automatic energy adjustment clause under 66 Pa. C.S. §1307 as a cost of generation supply under 66 Pa. C.S. §2807.

Such an interpretation is reasonable and not inconsistent with the plain language of the AEPS Act. The PUC, as the administrative body charged with implementing the AEPS Act and the Code, is entitled to substantial deference in the performance of its duties, and its interpretation of the law should not be overturned unless it is clear that such construction is erroneous, which Petitioners have not demonstrated here. *See Pennsylvania Power Co. v. Public Utility Commission*, 932 A.2d 300, 306 (Pa. Cmwlth. 2007) (extending deference to the PUC's interpretation of the Electricity Generation Customer Choice and Competition Act, 66 Pa. C.S. §§2801-2812).

Moreover, to conclude otherwise and accept the interpretations advanced by Petitioners would lead to an absurd result. As the PUC explains, although Petitioners currently limit their argument to interconnection costs as being an indirect cost of alternative energy, the logical extension of their position is that *all* costs associated with project development -- construction, financing, and operation of a customer-generator system -- would similarly qualify as indirect costs. This runs counter to two statutory construction principles: (1) "[t]hat the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable"; and (2) "[t]hat the General Assembly intends to favor the public interest as against any private interest." 1 Pa. C.S. §1922(1), (5). Further, requiring ratepayers to fully subsidize the development of alternative energy projects would also run counter to Section 1301 of the Public Utility Code, 66 Pa. C.S. §1301, which provides "[e]very rate made, demanded, or received by any public utility . . . shall be just and reasonable, and in conformity with regulations or orders of the [PUC]." For these reasons, we deny the relief requested as set forth in Requests for Relief A, B, and C in the Amended PFR.

### *Amended PFR, Requests for Relief D and I*

Next, Petitioners claim that any PUC Regulation that allows an EDC to charge a customer-generator for costs associated with the interconnection of a customer-generator's alternative energy system is invalid under the AEPS Act. Specifically, Petitioners challenge Section 75.39(e)(4) of the Regulations, 52 Pa. Code §75.39(e)(4),[9] which requires a customer-generator to pay for studies or improvements for the interconnection of an alternative energy system, as unlawful and contrary to the AEPS Act. They also object to the PUC practice of allowing EDCs to impose costs on customer-generators. Thus, Petitioners ask this Court to invalidate the PUC Regulations and practices that allow EDCs to charge customer-generators for distribution system improvement costs related to interconnection.

However, as Petitioners themselves recognize, the declarations sought under Requests for Relief D and I are wholly dependent upon the success of their claims under Requests for Relief A through C. Having determined that Petitioners are not entitled to relief on Requests for Relief A, B, and C, Petitioners are similarly

---

[9] Section 75.39(e)(4) provides:

> Upon completion of the interconnection facilities study, and with the agreement of the interconnection customer to pay for the interconnection facilities and distribution upgrades identified in the interconnection facilities study, the EDC shall provide the interconnection customer with a standard small generator interconnection agreement within 5 business days.

52 Pa. Code §75.39(e)(4).

21

not entitled to relief on these dependent claims.[10]  We, therefore, deny the relief requested as set forth in Requests for Relief D and I in the Amended PFR.

### *Intervenors' Application for Intervention, Request for Relief ¶78(a)*

Lastly, Petitioners claim they are entitled to the Request for Relief ¶78(a) presented by Intervenors in their Application to Intervene, which concerns how and when customer-generators are paid by EDCs for excess energy. Specifically, Petitioners challenge the PUC's Regulation codified at 52 Pa. Code §75.13(d) and (e), which establishes that EDCs accumulate excess energy supplied until the end of the reporting year (June 1-May 31), after which the EDCs pay the customer-generators.  According to Petitioners, the AEPS Act does not grant the PUC rule-making authority over this aspect of the Act.  Rather, Section 5 of the AEPS Act granted the PUC the narrow authority to issue "technical and net metering interconnection rules."  Regulating when and how customer-generators are paid for the excess energy they produce does not qualify as such a rule.  Therefore, this Court should declare 52 Pa. Code §75.13(d) and (e) invalid and unenforceable.

In 2007, the General Assembly amended Section 5 of the AEPS Act by adding this provision: "Excess generation from net-metered customer-generators shall receive full retail value for all energy produced on an annual basis." 73 P.S. §1648.5.  Prior to the amendment, customer-generators were compensated based on a "monthly standard at the avoided cost of wholesale power." *See In Re Implementing of Act 35 of 2007: Net Metering and Interconnection*, 103 Pa. P.U.C. 91, 2008 WL 6690078 (Pa. P.U.C., filed July 2, 2008).  The payment provision

---

[10] We further note that there appears to be disputed issues of fact concerning tariffs and CIACs, which favors denying summary relief.  *See* Respondents' Brief at 16; see also *Gregory*, 185 A.3d at 1205.

appears in the same section directing the PUC to develop "technical and net metering interconnection rules" for customer-generators, which was not altered. *Id*.

Following the statutory amendment, the PUC made corresponding changes to its Regulations. Specifically, Section 75.13(d) and (e) of the Regulations provide:

> (d) An EDC and [default service provider] shall credit a customer-generator at the full retail kilowatt-hour rate, which shall include generation, transmission and distribution charges, for each kilowatt-hour produced by a Tier I or Tier II resource installed on the customer-generator's side of the electric revenue meter, up to the total amount of electricity used by that customer during the billing period. If a customer-generator supplies more electricity to the electric distribution system than the EDC and [default service provider] deliver to the customer-generator in a given billing period, the excess kilowatt hours shall be carried forward and credited against the customer-generator's kilowatt-hour usage in subsequent billing periods at the full retail rate. Any excess kilowatt hours that are not offset by electricity used by the customer in subsequent billing periods shall continue to accumulate until the end of the year. For customer-generators involved in virtual meter aggregation programs, a credit shall be applied first to the meter through which the generating facility supplies electricity to the distribution system, then through the remaining meters for the customer-generator's account equally at each meter's designated rate.

> (e) *At the end of each year*, the [default service provider] shall compensate the customer-generator for any remaining excess kilowatt hours generated by the customer-generator that were not previously credited against the customer-generator's usage in prior billing periods at the [default service provider]'s price to compare rate.

52 Pa. Code §75.13(d), (e) (emphasis added). The IRRC approved the changes, noting they implemented the General Assembly's amendment and were consistent

with statutory authority. *See* PUC Brief, Exhibit 3 (IRRC Approval Order, Regulation No. 57-264 (#2724), 11/6/08).

Section 5 of the AEPS Act authorizes the PUC to develop "technical *and net metering* interconnection rules." 73 P.S. §1648.5 (emphasis added). Regulations promulgated pursuant thereto are lawful if they were "(a) adopted within the agency's granted power, (b) issued pursuant to proper procedure, and (c) reasonable." *Marcellus Shale*, 292 A.3d at 927. As this Court held in *Hommrich I*, 231 A.3d at 1037, the General Assembly did not task the PUC with redefining statutory terms and eligibility standards. However, unlike the regulation at issue in *Hommrich I*, the challenged Regulation here does not redefine terms or eligibility standards. Rather, the Regulation provides necessary guidance on net metering, specifically, how excess generation is measured, credited, and compensated at the full retail rate on a yearly basis, consistent with the terms of the AEPS Act. By its very definition, "net metering" is "[t]he means of measuring the difference between the electricity supplied by an electric utility and the electricity generated by a customer-generator when any portion of the electricity generated by the alternative energy generating system is used to offset part or all of the customer-generator's requirements for electricity." Section 2 of the AEPS Act, 73 P.S. §1648.2. Customer-generators are entitled to receive compensation for the "excess generation," *i.e.,* the difference between the electricity generated by a customer-generator and electricity supplied by the utility, "at the full retail value . . . *on an annual basis*." 73 P.S. §1648.5 (emphasis added). Although Petitioners advocate for monthly or even quarterly revenue, Section 5 of the AEPS Act clearly provides

24

for compensation on an annual basis.[11]  73 P.S. §1648.5.  Upon review, the Regulation falls within the ambit of the PUC's regulatory authority under the AEPS Act and tracks the statutory language.  For these reasons, we deny the relief requested in Intervenors' Application for Intervention, Request for Relief ¶78(a).

### III. Conclusion

Based on the foregoing, we deny Petitioners' ASR.

_____
MICHAEL H. WOJCIK, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

---

[11] We further note that Section 5's "annual basis" provision corresponds with Section 3(e)(5) of the AEPS Act, which provides that the alternative energy credits program shall be based on a 12-month "reporting period" from June 1 through May 31.  73 P.S. §1648.3(e)(5); *see* Section 2 of the AEPS Act, 73 P.S. §1648.2 (defining "reporting period').

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David N. Hommrich,           :
                              :
                 Petitioner   :
                              :
            v.             :  No. 463 M.D. 2022
                              :
Commonwealth of Pennsylvania,  :
Pennsylvania Public Utility      :
Commission,                :
                              :
                Respondent :

**O R D E R**

AND NOW, this 13th day of August, 2025, Petitioner's Application for Summary Relief is **DENIED**.

_____
MICHAEL H. WOJCIK, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David N. Hommrich, : 
                     Petitioner : 
                                  : 
            v. : No. 463 M.D. 2022
                                  : Argued: April 9, 2025
Commonwealth of Pennsylvania, : 
Pennsylvania Public Utility : 
Commission, : 
                   Respondent : 


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE LORI A. DUMAS, Judge
                HONORABLE STACY WALLACE, Judge
                HONORABLE MATTHEW S. WOLF, Judge


CONCURRING AND DISSENTING OPINION
BY JUDGE WALLACE                         FILED: August 13, 2025


      I would hold, based on the plain statutory text, that excess alternative energy purchased from net metered customer-generators under Section 5 of the Alternative Energy Portfolio Standards Act (AEPS Act)[1] is a "resource" as that term appears in Section 3(a)(3)(ii) of the AEPS Act,[2] and I would grant summary relief with respect to Request for Relief A. I otherwise join the Majority's thoughtful opinion, denying

---

[1] Act of November 30, 2004, P.L. 1672, *as amended*, 73 P.S. § 1648.5.

[2] 73 P.S. § 1648.3.

summary relief as to the remaining requests.  Therefore, I respectfully concur and dissent.

_____

STACY WALLACE, Judge